**VAQUERO PETROLEUM COMPANY, Appellant,**

v.

**Alvin C. SIMMONS, et al., Appellees.**

No. 2402.

Court of Appeals of Texas, Corpus Christi.

June 17, 1982.

Sam E. Rowland, Houston, for appellant.

J. Anthony Hale, P. C., Houston, for appellees.

Before NYE, C. J., and BISSETT and YOUNG, JJ.

## OPINION

BISSETT, Justice.

This is an appeal from the granting of a motion by Alvin C. Simmons and John W. White to dismiss Vaquero Petroleum Company's suit against them, which resulted in a take nothing judgment being rendered against Vaquero Petroleum Company (hereinafter "Vaquero"). The action by the trial court is challenged in a single point of error on the ground that the evidence adduced at the trial precluded the rendition of a take nothing judgment because such evidence constituted a "prima facie" case against Simmons and White. A brief history of the lawsuit as a whole is necessary in order for this appeal to be put in its proper perspective.

Oleum, Inc. (hereinafter "Oleum") filed suit against Swatco Energies, Inc. (hereinafter "Swatco") on November 18, 1978. In that suit, Oleum alleged that it and Swatco entered into a joint venture agreement on March 1, 1978, and that subsequently the venture acquired certain oil and gas leases in Calhoun County, Texas, and that Swatco, in September, 1978, sold the working interests in the leases to third parties and reserved unto itself a 6.25% overruling royalty interest and a reversionary 25% working interest in each of the subject leases. Oleum further alleged that under the joint venture agreement, it was entitled to share in such overriding royalty and reversionary working interests, but that Swatco refused to assign such interests to it. Whereupon, suit was filed to recover its alleged beneficial interests in the overriding royalties and reversionary working interests owned by Swatco.

Vaquero intervened in the suit between Oleum and Swatco on November 17, 1979;

it claimed that it had an interest in the controversy and asked that a constructive trust be imposed upon the subject leases. In April, 1979, Vaquero, by third party pleadings, made Simmons and White parties to the suit. Vaquero also made Oleum, Falcon Seaboard, Inc. and Diamond Shamrock Corporation third party defendants. Vaquero asked that a constructive trust be imposed in its favor on the affected oil, gas and mineral leases and the revenues therefrom, for specific sums of damages against all third party defendants because of conversion of Vaquero's work product, civil conspiracy, and unwarranted interference with Vaquero's corporate opportunities. In addition, Vaquero sought exemplary damages from Oleum, Falcon Seaboard and Diamond Shamrock. All third party defendants filed answers.

Next, Oleum and Swatco settled all matters in controversy between them and the suit between them was dismissed with prejudice on April 13, 1981. No one appealed that judgment. However, Vaquero's suit against Swatco, Simmons, White, Oleum, Falcon Seaboard and Diamond Shamrock, as third party defendants, was not affected by the aforesaid dismissal.

The action brought by Vaquero against Swatco and the aforesaid third party defendants was tried before the District Court of Calhoun County, Texas, sitting without a jury, on July 15, 1981. Counsel for Vaquero, in his opening statement, asked the trial court to:

"... [d]eclare that Vaquero be declared the owner of the South Greenlake Prospect, Bauer Prospect as it is here, and that all monies received by Mr. Simmons, Mr. White and the corporate Defendant, Swatco, for sale of the prospect, be paid to Vaquero, that all retained and reversionary interests of Swatco, Simmons and-or White, be assigned to Vaquero, that the Court appoint a receiver to prepare an accounting to achieve all of the foregoing, and that Vaquero be allowed the costs of these proceedings as well as its attorneys' fees and that Vaquero be allowed exemplary or punitive damages

in the amount of $500,000.00 and whatever other relief the Court would see fit to grant."

At the time when the cause was called for trial, Swatco had not been served with citation by Vaquero. The record does not show that Swatco waived service of process or made an appearance with respect to the claims asserted against it in Vaquero's petition in intervention. At the conclusion of Vaquero's evidence, and in response to the motion made to dismiss by counsel for Simmons and White, the court rendered a take nothing judgment in favor of Simmons and White. The judgment expressly provided: "All other relief not expressly granted herein is denied."

Counsel for Vaquero, in his brief filed in this Court, says:

"[I]n January of 1979, Vaquero Petroleum Company intervened in this suit and subsequently filed third party actions against Oleum, Swatco, Falcon Seaboard, Inc., Diamond Shamrock Corporation, Alvin Simmons, and John White. After Vaquero's intervention, all matters in controversy were compromised and settled as between Vaquero and Oleum and Oleum's parent corporations, Falcon Seaboard, Inc., and Diamond Shamrock Corporation. Immediately prior to trial, Swatco Energies, Inc. was also dropped from the case, leaving only the controversy between Vaquero and Simmons and White to be settled by the Court...."

At the outset, we note, *sua sponte*, that the judgment does not dispose of the claim made by Vaquero against Swatco in its petition in intervention, nor does it adjudicate the claims made by Vaquero against Oleum, Falcon Seaboard and Diamond Shamrock. The judgment expressly states, however, that "the above-entitled and numbered cause" came on to be heard on the 15th day of July, 1981, and that Vaquero and "the Third Party Defendants, John White and Alvin Simmons," appeared in person and by attorney "and announced ready for trial." No evidence was introduced by Vaquero against Swatco, Oleum, Falcon or Diamond Shamrock. Apparently,

all parties present at the trial, as well as the trial court, believed that Vaquero was no longer prosecuting any claims against Swatco, Oleum, Falcon Seaboard and Diamond Shamrock. We consider that the judgment under attack is a final judgment for purposes of appeal under the rule and rationale of *North East Independent School District v. Aldridge*, 400 S.W.2d 893 (Tex. 1966). We particularly take note of the statement made by Chief Justice Calvert on page 898, wherein he said:

"... Of course, the problem can be eliminated entirely by a careful drafting of judgments to conform to the pleadings or by inclusion in judgments of a simple statement that all relief not expressly granted is denied."

We believe that "the problem" was "eliminated" in the case at bar since the judgment denied all relief not expressly granted.

Neither Simmons nor White presented any evidence. Vaquero, in this appeal, contends that its evidence, which was not controverted by Simmons and White, precluded the rendition of a take nothing judgment since its evidence established prima facie: 1) a breach of fiduciary duty by Simmons and White which warranted the imposition of a constructive trust upon certain properties; 2) an unwarranted interference by Simmons and White with its business; 3) a diversion by Simmons and White of Vaquero's corporate opportunity, and 4) a conversion by Simmons and White of Vaquero's work product.

Vaquero is an oil and gas exploration and production company operating in the upper Texas Gulf Coast. It originates ideas for geologic prospects, acquires oil and gas leases, and then seeks joint ventures to finance the drilling of wells and, if successful, develops the leases for the production of oil and gas. Since its inception in February of 1975, J. P. Murphy has been the president and principal stockholder of Vaquero. He is not a party to this suit or to this appeal. In February, 1976, Simmons became a vice president of Vaquero. In March, 1976, White was hired by Vaquero as a geologist.

Murphy was responsible for the general supervision of the company and its business affairs. Simmons was charged with the drilling operations of the company. White performed geologic services for the company and was responsible for studying and recommending drilling prospects.

Simmons left the employ of Vaquero on December 31, 1977, and formed Swatco Energies, Inc., on January 13, 1978. White left Vaquero in February, 1978, and went to work for Swatco.

In February, 1976, Vaquero and Oleum had some discussions and contacts with respect to the formation of a joint venture for the drilling of oil and gas prospects. The formal agreement was signed on April 1, 1976, effective February 1, 1976. Under this agreement, Vaquero was to find oil and gas exploration projects, and then submit the prospects to the joint venture management committee for approval. If it approved a prospect, Oleum would then furnish the funds needed to purchase the leases and to pay for the physical work required to drill the prospect. The agreement further provided that the venture would continue "as a continuing program until December 31, 1976" (unless sooner terminated as provided elsewhere in the agreement), except for necessary winding up of the affairs of the venture.

Also, in February, 1976, Vaquero, Murphy and Simmons entered into a joint venture agreement. This agreement expressly noted that Vaquero is negotiating a joint venture agreement with Oleum "for the purpose of obtaining drilling prospects for oil and gas." The agreement further provided:

"The purpose of this agreement will be to complete the requirements of that joint venture (with Oleum) referred above and to assist Vaquero in acquiring exploration ideas, purchasing oil and gas leases, drilling exploratory tests, producing and marketing oil and gas for its own account and for the account of other companies and individuals."

Murphy testified that at a later date the joint venture agreement was amended (in writing) to include White as a joint ventur-

er. The amendment is not in the record, but it is shown that Vaquero, Murphy and Simmons each owned a 30% beneficial interest in the venture and that White owned a 10% beneficial interest therein.

In August of 1976, John White recommended to Vaquero a project in Calhoun County, Texas, known as the "South Greenlake Prospect." According to Murphy, Vaquero spent approximately $31,000.00 developing this project into a prospect for submission to Oleum. Initially, Oleum approved this prospect and authorized the expenditure of the funds needed to acquire the necessary leases. However, in November, 1976, Oleum withdrew its authorization. Although Vaquero was free to pursue the prospect on its own after Oleum rejected it, Vaquero elected not to do so, and no action was taken by it at any time thereafter to acquire oil and gas leases on any of the lands in the South Greenlake Prospect.

On March 1, 1978, Swatco entered into a joint venture agreement with Oleum. Apparently, this agreement was similar in most respects to the Vaquero-Oleum joint venture agreement. Thereafter, Swatco submitted several prospects to Oleum. One of the prospects, denominated the "Bauer Prospect," included the lands covered by the above-mentioned "South Greenlake Prospect." Oleum at first approved, but later rejected the Bauer Prospect. Subsequently, Swatco alone purchased the leases in the Bauer Prospect, and in 1978, drilled and completed three producing wells thereon.

Swatco, in July, 1978, sold its working interest in the leases which made up the Bauer Prospect for $235,000.00 in cash, and retained overriding royalties of 6.25% in the production from the leases and a reversionary 25% working interest in each of the subject leases. At that time the stock in Swatco was owned by Simmons, White and William Tillack. Later, the overriding royalties were assigned by Swatco to Simmons, White, Tillack and Oleum.

The record reflects, as noted above, that White initiated Vaquero's interest in South Greenlake, and that after Oleum refused to participate in the acquisition of the leases comprising the project and to the drilling of an exploratory well thereupon, Vaquero elected not to pursue the project at that time. In this regard, Murphy, Vaquero's president, testified that following Oleum's refusal to participate, he and Simmons, the management committee for Vaquero, "decided we would wait until we formed a new venture agreement in '77 (1977) and submit the project to a new venture." Murphy further testified:

"Q. During 1977 what were your conversations, if any, with Mr. Simmons and Mr. White with regard to Vaquero acquiring the acreage under the South Greenlake Prospect?

A. There were several discussions between Mr. White and Mr. Simmons and myself. The status of the Greenlake Prospect was that it was subject to the Oleum-Vaquero joint venture and being subject to that agreement the acquisition would have been out of the profits of that joint venture. On at least four occasions Mr. Simmons and I discussed the acquisitions. Mr. Simmons' expenditure on other wells he was drilling put him in a position he needed a cash distribution of profits and he repeatedly asked that we not buy the prospect, that we hold it and let someone else buy it, that it just wasn't a good enough prospect to use our own money on. Mr. White recommended, I would suppose at least once a week, that we buy the prospect."

Murphy further stated that Vaquero, after Oleum turned down the South Greenlake Prospect, never acquired any lease on any land in the Prospect.

Findings of Fact and Conclusions of Law were requested and filed. In its Findings of Fact, the trial court found: 1) Vaquero never exercised its right to acquire the South Greenlake Prospect; 2) John White fairly and properly presented the Prospect to Vaquero; 3) Simmons and White left the employ of Vaquero on December 31, 1977 and February 28, 1978, respectively; 4) the

leases supporting the South Greenlake Prospect were purchased after Simmons and White left their employment with Vaquero; and 5) nothing that Simmons or White did or failed to do damaged Vaquero's ability to acquire the leases supporting the South Greenlake Prospect, which had been rejected by Vaquero.

In its Conclusions of Law, the trial court concluded: 1) Vaquero never acquired a property interest in the South Greenlake Prospect and thus had no claim thereto; 2) Vaquero lost any right to acquire the South Greenlake Prospect by failing to purchase the leases supporting the Prospect and had no legal right to the same; and 3) Vaquero's failure to acquire the leases supporting the Prospect was caused by Vaquero's own decision not to purchase any of those leases. Vaquero does not specifically challenge either the findings or conclusions of the trial court.

As already stated, Vaquero contends that Simmons' and White's use of information concerning the South Greenlake Prospect for their own gain was a breach of their fiduciary duty to Vaquero and a diversion of a corporate opportunity of Vaquero which required the imposition of a constructive trust on Simmons' and White's interests in the South Greenlake leases. In support of these contentions, Vaquero cites numerous cases which discuss the law relative to fiduciary duties and the imposition of a constructive trust on properties where there has been a breach of a fiduciary duty. In each of these cases, however, the facts are significantly different from those in the case at bar.

In each case cited by Vaquero, there was a fiduciary or confidential relationship existing between the parties *at the time of* the particular breach of fiduciary duty involved. *See, e.g., Hunter v. Shell Oil Co.,* 198 F.2d 485, 487 (5th Cir. 1952); *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576–577 (Tex.1963); *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 404 (1960); *Smith v. Bolin,* 153 Tex. 486, 271 S.W.2d 93, 95 (1954); *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256,

257–258 (1951); *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334, 338 (1944).

In the case at bar, there was *no* fiduciary or confidential relationship existing between Vaquero, on the one hand, and Simmons and White, on the other, at the time the latter acquired the South Greenlake leases. Thus, Vaquero's claim for a constructive trust must be founded only upon Simmons' and White's use of information acquired by them during the existence of a confidential relationship with Vaquero.

■ A constructive trust "must be used with caution" because it does not arise on every moral wrong" and "it cannot correct every injustice." *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559 (1948).

■ Each person must exercise due care for the protection of his own business interests, and the fact that a confidential relationship existed at one time is not sufficient to impose a constructive trust on properties acquired by confidant *after* the confidential relationship terminated, when the confider had the means to adequately protect his own interest in the subject properties prior to their acquisition by the confidant, and did not do so. *Courseview, Inc. v. Phillips Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197 (1957); *Lindsey v. Dougherty,* 60 S.W.2d 300 (Tex.Civ.App.—Amarillo 1933, writ ref'd).

■ A confidential relationship does not of itself give rise to the imposition of a constructive trust, but an abuse of confidence rendering the acquisition or retention of property by one person unconscionable suffices in general for the imposition of a constructive trust upon the affected properties. *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951).

■ A constructive trust is a legal fiction imposed by the courts to prevent unjust enrichment. *Meadows v. Bierschwale,* 516 S.W.2d 125 (Tex.1974); *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401 (1960); *Talley v. Howsley,* 142 Tex. 81, 176 S.W.2d 158 (1944). Thus, the primary question to be resolved is whether a constructive trust

should be imposed in favor of Vaquero on the royalties assigned to Simmons and White by Swatco in order to prevent unjust enrichment of Simmons and White.

■ It is established by the evidence that a confidential relationship existed between Vaquero, Murphy, Simmons and White during the times that Simmons and White were employed by Vaquero. Unquestionably, during that interval of time, Simmons and White owed a fiduciary duty to Vaquero which precluded them from acquiring the leases which made up the South Greenlake Prospect to the exclusion of Vaquero and in derogation of its rights under the joint venture agreement between them. However, the confidential relationship terminated prior to the time that Swatco acquired the leases, and certainly, long after Simmons and White acquired their royalty interests.

The joint venture between Oleum and Vaquero terminated on December 31, 1976. The joint venture between Vaquero, Murphy, Simmons and White was formed for the express purpose "of completing the joint venture with Oleum" and "to complete the requirements of that joint venture." There is no evidence that the joint venture between Vaquero, Murphy, Simmons and White continued beyond December 31, 1977.

Considerably more than a year elapsed from the date·Vaquero put aside the South Greenlake property until Swatco acquired the subject leases. Even more time elapsed before production was established on the leases, and an additional period of time passed before Simmons and White acquired their royalty interest. Vaquero had more than a year to acquire leases covering the South Greenlake Prospect after Oleum withdrew from the joint venture. There is no evidence in the record that either Simmons or White prevented Vaquero from acquiring the leases or misled Vaquero in any way. To the contrary, the record shows that White, the only joint venturer who was qualified to approve the drilling of the Prospect recommended the same to Vaquero "at least once a week" until the time he left Vaquero's employ in February, 1978.

■ In view of Vaquero's virtual abandonment of the South Greenlake Prospect in 1976, we fail to see how Simmons and White were in any manner *unjustly enriched.* Swatco alone bore the risks involved in the development of the South Greenlake leases after Vaquero repeatedly refused to do so. Allowing Vaquero to share in the profits from South Greenlake accruing to Simmons and White after Swatco took the risks and made it successful would permit *Vaquero* to be *unjustly enriched* at the expense of Simmons and White. While we recognize that from February, 1976 until the termination of Simmons' and White's employment with Vaquero, the relationship of the parties was fiduciary in character, those duties extended only to dealings within the scope of the underlying relationship of the parties. The fiduciary relationship which existed between Vaquero, Murphy Simmons and White did not forbid or prohibit any party from acquiring leases which were once considered as a prospect for the joint venture after the confidential and fiduciary relationship terminated. See *Rankin v. Naftalis,* 557 S.W.2d 940 (Tex.1977). Vaquero, who had ample opportunity to pursue the prospect, did not do so.

After reviewing the evidence, we hold that the evidence does not establish "prima facie" that there was a breach of fiduciary duty by Simmons and White which would justify the imposition of a constructive trust for the benefit of Vaquero on the subject properties.

■ To establish a cause of action for interference with business opportunity, Vaquero was required to show a willful and intentional interference with its business relations, without cause or excuse, which caused it injury. *Frost National Bank v. Alamo National Bank,* 421 S.W.2d 153, 156 (Tex.Civ.App.—San Antonio 1967, writ ref'd n. r. e.); *Cooper v. Steen,* 318 S.W.2d 750, 755, 757 (Tex.Civ.App.—Dallas 1958, no writ).

■ The business relation which Simmons and White allegedly interfered with was between Vaquero and Oleum. Murphy

testified, however, that Vaquero's joint venture agreement with Oleum, as to the Greenlake Prospect, terminated on December 31, 1976. During all of 1977 and the early part of 1978, the lands composing the South Greenlake Prospect were open for mineral leasing. Vaquero, along with Simmons and White, were fully advised of the geological information which indicated that the affected lands showed promise for production of oil and gas. Vaquero had the exclusive opportunity to develop the Prospect during all of 1977 and did nothing. The interference, if any, occurred when Swatco, acquired the leases on lands composing the original South Greenlake Prospect. We hold that this interference, if in fact Swatco did so interfere, does not establish, "prima facie," a willful and intentional interference by Simmons and White with Vaquero's business relations with Oleum, or with anyone else.

Vaquero next contends that it established, prima facie, a civil conspiracy on the part of Simmons and White to deprive it of its property and property rights. Such an action arises only where two or more persons, acting together, commit an unlawful act, or they accomplish a lawful purpose by unlawful means. *Schulumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968); *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex.1963). We hold that it was not unlawful for Swatco to develop the South Greenlake leases. Simmons and White did not develop the leases. Their sole interests are in the royalty assigned to them by Swatco. There is no claim that Swatco was the alter ego of Simmons and White. Vaquero's civil conspiracy claim is without merit.

There is no evidence which would require an accounting between Vaquero on the one hand, and Simmons and White on the other. There is no evidence that Simmons and White converted any work product or any property belonging to Vaquero.

We have carefully considered Vaquero's points and all contentions and claims thereunder. None can be sustained. The trial judge correctly granted the motion to dismiss and properly rendered a take nothing judgment. The point is overruled.

The judgment of the trial court is AFFIRMED.