**G.T. McALPIN, et al., Appellants,**

v.

**A.R. SANCHEZ, Sr., et al., Appellees.**

**No. 13–91–026–CV.**

Court of Appeals of Texas, Corpus Christi.

April 8, 1993.

Rehearing Overruled May 6, 1993.

Publication Ordered June 30, 1993.

Jerry R. Prothro, Boyd, Sanders, Wade, Cropper & Prothro, Midland, Errol John Dietze, Dietze & Reese, Cuero, Cynthia T. Sheppard, Houston, Marek & Griffin, Victoria, for appellants.

Gerald T. Drought, Troy "Trey" S. Martin, III, Martin, Drought & Torres, Inc., San Antonio, for appellees.

Before DORSEY, KENNEDY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

DORSEY, Justice.

This case involves the imposition of a constructive trust on two oil and gas leases for the benefit of the prospective investors in those leases. The jury found that appellant G.T. McAlpin breached his fiduciary duty and his duty of good faith and fair dealing to one of those investors, Malcolm McGregor, when he acquired the two leases, ostensibly for the benefit of all of the investors, yet kept them for himself. By ten points of error, the McAlpins contend that the trial court erred by establishing a constructive trust in favor of not only McGregor but all of the investors, and by excluding the testimony of an expert witness, by disregarding the jury's finding of estoppel, and by awarding the investors their attorney's fees. By two cross-points, the investors contend that the trial court improperly disregarded the jury's finding that McAlpin was liable for the expenses they incurred by drilling a dry well. The judgment of the trial court is modified, and, as modified, is affirmed.

## FACTS

In early 1984, G.T. McAlpin contacted Malcolm McGregor, with whom he'd done business in the past, and informed him that a friend, Mrs. Post, held an unleased 195.5 acre tract of land situated very near a known producing oil well. McAlpin invited McGregor to invest in that tract with him. McGregor, a geologist, investigated that tract and the area around it and, optimistic that it was a producing field, agreed to lease the property with McAlpin. The two men formed an oral partnership agreement, covering the development of the entire area tested by McGregor, that area being The Woods Cemetery Field. In order to develop the Field, however, and achieve the goal of the partnership, it was necessary to soli-

cit investors to contribute the capital to finance buying the leases and drilling wells.

The men orally agreed to at least eight partnership terms: 1) this would be a 50/50 partnership; 2) McAlpin would be the land man, acquiring the leases for the partnership, while McGregor would do all else, including securing investors, operating the leases, and the like; 3) they would divide their lease costs; 4) they would sell 75% of their interest in the leases to non-partner investors; 5) McAlpin and McGregor would split the remaining 25% of that working interest; 6) the two men would divide a $3\frac{1}{3}$% overriding royalty interest in the leases acquired by the partnership; 7) they would split the profits from the sale of the 75% working interest; and 8) the first well would be drilled to casing point with no expense incurred by McAlpin and McGregor.

The men entered into this partnership in February, 1984, with McAlpin, the landman, acquiring the 195.5 acre tract from Mrs. Post, called the "Post lease," for the partnership. McGregor, the geologist, secured investors to finance the drilling on the property, many of whom had dealt with him in the past. These investors purchased a combined 75% of the leasehold interests. McGregor formed a letter agreement with each of the investors, explaining each investor's duties with regard to drilling and development of that particular lease. This agreement expressly stated that it would not create a partnership or joint venture between the participants and that it reflected the entire agreement between the parties. If a drilled well became a commercial producer, at that time a Joint Operating Agreement would become controlling. It, too, expressly discounted any formation of a partnership between the participants, and provided for each investor's percentage interest in the expense and production of

the commercial well on the designated lease, as well as further operations on that particular lease. McAlpin and McGregor were each 14.5% working interest owners under the Joint Operating Agreement, with the remaining investors holding pro rata shares of the balance.

McAlpin, the landman, soon leased two more tracts for the partnership, the Hoegemeyer and Wilems leases. When they were acquired by the partnership, pursuant to the partnership agreement, McAlpin and McGregor retained 25% of the leases while selling 75% to the investors. The leases were then included under the Joint Operating Agreement.[1]

The investors drilled a well on the 195.5 acre Post lease in August 1984, resulting in a dry hole. They then drilled Hoegemeyer # 1 in December, 1984, a flowing well, Hoegemeyer # 2 (March, 1985), a dry hole, and then Hoegemeyer # 3 (August, 1988), a commercially flowing well that invoked the rights and duties of the parties under the Joint Operating Agreement. The rights and duties assumed by the parties under the various agreements with regard to the Hoegemeyer # 3 are at issue here.

A synopsis of the complex transactions related to drilling the # 3 is necessary. The 195.5 acre Post lease, acquired on February 28, 1984, and the Wilems lease, acquired in May, 1984, both had three year terms. McAlpin and McGregor mutually agreed to let those two leases lapse early in 1987 rather than renew them, as it appeared at the time that neither tract contained producible amounts of oil. Then in late 1987 or early 1988, the partnership began planning to drill Hoegemeyer # 3. As a precautionary measure, the partnership first wanted to be able to drill offset wells to the # 3, if it was successful, to protect the investors from drainage.

---

1. The "Contract Area" covered by the Agreement is defined as all of the lands, oil and gas leasehold interests, and oil and gas interests intended to be developed and operated under the agreement. Such lands and interests are described in "Exhibit A" of the agreement. Each time a new lease was acquired, McGregor would amend "Exhibit A" to add the new lease, then circulate that amended "Exhibit A" to all participants, along with a new signature page. The participants, if they so chose to invest in the new lease, would then replace the previous "Exhibit A" in their personal copies of the agreement with the new one and return their signature pages to McGregor.

McGregor, the geologist, therefore requested that McAlpin, the landman, re-lease two 40–acre tracts to the North of the # 3.[2]

McAlpin informed McGregor that Angela McAlpin, the landman's wife, having never purchased an oil and gas lease before, had already purchased one of the 40 acre tracts from Mrs. Post. McGregor asked McAlpin to have his wife assign her 40–acre lease to McGregor for the benefit of the partnership and the investors, and to lease the other 40 acres from Mrs. Post himself, for the benefit of the partnership. McAlpin complied in May 1988, but, in the process, Mrs. McAlpin retained a substantial overriding royalty interest in her 40 acre lease. In addition, G.T. McAlpin gave drilling commitments on both tracts to his wife and to Mrs. Post, promising to drill a well on one of the two leases within 30 days of the date the Hoegemeyer # 3 was completed, if it was completed as a flowing well. McAlpin did not inform McGregor of these drilling commitments, however. After being assigned the two 40 acre leases with no knowledge of the drilling commitments, McGregor assigned them to the joint account.

The Hoegemeyer # 3 well was drilled in August, 1988, and was completed on or shortly after the last day of the month. The well was a commercially producing well, emitting over 100 barrels of oil per day. Consequently, to further protect the investors and avoid drainage of the producing strata by third parties, McGregor requested that McAlpin lease an additional 40.5 acre tract from Mrs. Post that was adjacent to the Hoegemeyer tract.[3] The men had since learned that a producing oil zone ran under this 40.5 acre tract. The men discussed the inevitability that Mrs. Post would request a drilling commitment on that lease because she was anxious to have a well drilled somewhere on her property. McAlpin negotiated this lease, agreeing to acquire not only the 40.5 acre tract but also a separate 25 acre tract.[4]

McGregor testified that McAlpin told him he gave Mrs. Post an oral 120–day drilling commitment on the 65.5 acre lease, requiring the partnership to drill a well on it within 120 days of the completion of the Hoegemeyer # 3. McGregor knew it would be impossible to drill a well that quickly because it would be necessary to petition the Railroad Commission for a Rule 37 exception as to spacing density of the proposed well to do so, which would require too much time. McGregor knew that the failure to satisfy a drilling commitment would result in a lawsuit for drainage and breach of an oral contract. McGregor asked McAlpin to renegotiate that portion of the lease; McAlpin said he would do so and later represented that he was making headway.

McGregor testified that McAlpin ultimately offered him the 65.5 acre lease with a verbal drilling commitment on it. Consequently, determining that the lease would be of no benefit to the partnership because the commitment could not be met, McGregor declined to accept it. McGregor testified that McAlpin told him in that case he would keep the lease for himself.

McAlpin testified, on the other hand, that when he met McGregor to give him the 65.5 acre lease, McGregor accused him of never actually leasing the property and said that all he needed was money in order to obtain the lease for himself. McAlpin testified that he became angered by this accusation and departed with the lease in his possession.

McGregor, the geologist, testified that he soon tried to patch up his disagreement with McAlpin, asking him to assign the 65.5 acre lease to the partnership under McAlpin's own terms. McGregor also asked McAlpin to obtain a time extension on the 65.5 acre drilling commitment from Mrs.

2. That property was originally included in the 195.5 acre Post lease held by the partnership from 1984 to 1987.

3. This, too, was originally included in the 195.5 acre tract held and then released by the partnership.

4. This 25 acre tract was also part of the original 195.5 acre Post lease, and the partnership drilled the Post # 1 dry hole on it several years before.

Post, as well as a pooling clause on the two 40 acre tracts. At the same time, McAlpin asked McGregor if he wanted to lease the remaining 50 acres of Mrs. Post's property. McGregor responded that he already had a broker in the field attempting to lease the 50 acres and other properties in the Northern part of the Woods Field.

McAlpin told McGregor that if he would call off his broker, McAlpin would obtain the 50 acre lease for him. McGregor testified that he halted his broker, and McAlpin obtained the 50 acres; however, McAlpin did not offer the 50 acre lease to the partnership. In addition, Mrs. Post extinguished the impossible drilling commitment on the 40.5 acre lease, but McAlpin did not assign that lease, now valuable to the partnership, to McGregor either. This caused McGregor to write a letter to McAlpin, dissolving the partnership and continuing only those development projects already in progress.[5]

McAlpin testified that McGregor was using his own broker to purchase leases in the Northern region of the Woods Field in violation of the partnership agreement and that McGregor was excluding him from participating in that development. Consequently, McAlpin assumed he could retain the 65.5 and 50 acre leases for himself. He agreed to the dissolution of the partnership and did not participate in the pending projects in the Northern region.

On November 15, 1988, McGregor received a demand letter from Mrs. Post's and the McAlpins' attorney. The letter stated that the partnership and participants in the Joint Operating Agreement had not fulfilled the requisite drilling commitment on Mrs. McAlpin's 40 acre lease, and if they failed to do so within 30 days, they would be sued for drainage and breach of an oral contract. This was the first time McGregor heard about the drilling commitment on the 40 acre tract. To prevent a lawsuit, McGregor filed a petition with the Railroad Commission for permission to drill a well, the Post # 2, on Angela McAlpin's tract.

The well was proposed to be drilled as close to the producing zone located under McAlpin's 40.5 acre lease as possible. McAlpin contested the location, however, contending that the proposed well site lay too close to his 40.5 acre lease property line and that other legal locations existed on Angela McAlpin's tract. The Railroad Commission ultimately permitted the drilling of the Post # 2, which cost over $208,000 and resulted in a dry hole. McGregor later learned that the drilling commitment on the 40 acre Angela McAlpin lease could have been satisfied by drilling a well anywhere on Mrs. Post's property, including the 40.5 acre tract under which the oil channel flowed and which was now held by McAlpin.

## PROCEDURAL HISTORY

McGregor, the geologist, and the rest of the investors, plaintiffs below, filed suit seeking a declaratory judgment of the parties' rights, duties, liabilities, and legal relations under the joint operating agreement and other agreements and partnerships. The investors requested that the court require the McAlpins, the landman and his wife, to hold the 65.5 and 50 acre leases in constructive trust for them. The investors also requested actual and punitive damages for the McAlpins' breach of fiduciary duty and breach of the duty of good faith and fair dealing, as well as for fraudulent conduct and negligent misrepresentations. The investors further requested attorney's fees under the Declaratory Judgment Act.

The McAlpins counterclaimed, seeking a declaratory judgment with regard to the interests of the parties in the two 40 acre leases, requesting actual and punitive damages for fraudulent conduct on the part of the investors, and for the clouding of title and draining of the 65.5 and 50 acre leases. The McAlpins also requested · attorney's fees under the Declaratory Judgment Act.

The jury found G.T. McAlpin made fraudulent and negligent misrepresentations and breached his duties to McGregor.

5. These included the Hoegemeyer # 3 well and the Northern properties McGregor's broker was negotiating.

The jury also found, however, that the investors were estopped to complain of the McAlpins' actions. Nevertheless, they awarded $208,086.38 in actual damages to the investors for the drilling of the Post # 2 well, as well as $107,479 in attorney's fees. The jury found against the McAlpins on their counterclaims.

The court disregarded both the estoppel finding and the actual damage award. It found that McAlpin breached duties not only to McGregor, but to all of the investors, imposing a constructive trust in favor of all of them. It is this judgment that the McAlpins contest.

### POINTS OF ERROR

By point four, the McAlpins contend that the trial court erred by entering judgment in favor of all of the investors in the form of a constructive trust. The McAlpins assert that the jury made no finding on the issue of whether McAlpin owed a fiduciary duty or a duty of good faith and fair dealing to all of the investors. In addition, the McAlpins maintain that no evidence exists to support the court's imposition of the trust in favor of all of the investors. The investors contend that the issue was uncontroverted and therefore need not have been submitted to the jury, and that the McAlpins failed to preserve the error by failing to object to the omission of the desired question.

■ The McAlpins objected to the court's charge by requesting that all issues with regard to duty and fiduciary relationships not be submitted to the jury, as such issues are matters of law for the court to decide. Therefore, the substance of the parties' arguments on appeal concerns whether there is any evidence giving rise to a duty between McAlpin and the investors, as contrasted with McGregor individually, to support the court's imposition of a constructive trust for the benefit of all plaintiffs. A constructive trust is a legal fiction—a creation of equity to prevent a wrongdoer from profiting from his wrongful acts. *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex.1984); *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974). It is often imposed when a duty is breached between fiduciaries. *Gaines v. Hamman*, 358 S.W.2d 557, 560–61 (Tex.1962); *Vaquero Petroleum Co. v. Simmons*, 636 S.W.2d 762, 767 (Tex.App.—Corpus Christi 1982, no writ).

■ The parties do not take issue with the jury's findings and verdict that McAlpin breached his partnership duties to McGregor when he fraudulently misrepresented the nature of leases that were supposed to be acquired under the partnership agreement. The court agreed with the jury's findings that McAlpin breached that agreement. The court therefore interpreted that agreement.

Though oral, the partnership agreement was detailed by both men during trial, and those terms were not disputed. The term of most importance is the fourth: that the partners would sell 75% of the interests in the leases McAlpin acquired to non-partner investors, splitting the profits from those sales between themselves. The partnership agreement expressly provides that the two men own only 25% of these leases, while the rest of the plaintiffs, as investors incident to the partnership, owned the other 75%. The court properly recognized the investors' 75% interest under the partnership agreement. A construction of the terms of that agreement will support the imposition of the constructive trust in favor of all plaintiffs.

■ However, the wording of the judgment designating the parties' interests under the trust reflects those pro rata interests invoked under the Joint Operating Agreement. This is improper. Texas case law confirms the notion that the rights and duties incident to a joint operating agreement only arise during transactions relative to lands and leases expressly covered by the agreement.

It is common practice to conduct mineral development under a joint operating agreement, and while there are duties between the parties for the operations of the lands embraced by the written agreement, those duties do not extend to oper-

ations by one of the parties on other and different lands.

*Rankin v. Naftalis*, 557 S.W.2d 940, 946 (Tex.1977). The *Rankin* court held,

[Rankin's and plaintiffs'] fiduciary duties arose from the relationship of joint ownership of the mineral rights of a particular mineral lease. Their joint enterprise extended to paying the production costs of the wells on the Melton lease and sharing the benefits derived proportionately. Had the alleged impropriety been within the scope of these activities, as by one party's appropriating the operating expense account to purchase land in his own name, a breach of the fiduciary relationship would have occurred.

*Rankin*, 557 S.W.2d at 944; *see also Fuqua v. Taylor*, 683 S.W.2d 735, 738 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (joint venture relationship is fiduciary in nature; duties extend only to dealings within scope of that relationship).

The joint operating agreement at bar deals exclusively with the rights of the investors in the production of particular leases. The agreement does not apply to proposed, but unacquired, leases. The agreement by its terms covers only those lands and leases listed in "Exhibit A." No "Exhibit A" attached to the agreement ever included the 65.5 and 50 acre leases. Moreover, until the properties were actually purchased by the investors, they were not listed under the agreement.

■ Consequently, the joint operating agreement does not apply to the leases at issue in this case, and McAlpin owed no duty to the investors under that agreement. *See also Texstar N. Am., Inc. v. Ladd Petroleum Corp.*, 809 S.W.2d 672, 677–78 (Tex.App.—Corpus Christi 1991, writ denied); *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 912 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (citing *Texstar* with approval). In *Texstar*, the court held that the duty of good faith and fair dealing is not recognized absent a "special relationship" between the parties, such as between insurer and insured and between executive rights holder and non-executive working interest holder in a mineral estate. *Id.* at 677–78. "The agreement made by the parties and embodied in the contract itself cannot be varied by an implied good-faith-and-fair-dealing covenant." *Id.* at 677–78 (citation omitted).

■ Accordingly, the judgment requires modifications. It should reflect the parties' interests as prescribed by the partnership agreement and not by the Joint Operating Agreement. Thus, 12.5% of the interest in the leases belongs to McAlpin, as part owner of the leases under the partnership agreement. 12.5% of the leases belongs to McGregor, and the remaining 75% belongs to the proposed additional investors, the rest of the plaintiffs here. These investors' individual interests will be determined according to the investment each makes once the leases are conveyed to the joint account. The judgment is therefore modified to reflect these interests under the constructive trust. Point of error four is overruled.

By points five and six, the McAlpins assert that the trial court erred by imposing a constructive trust in favor of the investors because they did not have "clean hands." The McAlpins argue that the jury found the investors were estopped from asserting their claims against the McAlpins, and a finding of estoppel is identical to a finding of unclean hands. They contend that the trial court improperly disregarded this finding of estoppel in response to the investors' motion to disregard, because there is some evidence of estoppel.

■ When reviewing a grant of a motion to disregard a jury finding, we employ a legal sufficiency or "no evidence" test. We consider all evidence and reasonable inferences from it in the light most favorable to the jury's finding. *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 201 (Tex.1980). We must ignore all evidence to the contrary. *Schaefer*, 612 S.W.2d at 201. If any evidence of probative force exists to support the jury's finding, that finding must be upheld, and it was error for the trial court to have disregarded the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ For the McAlpins to prove their estoppel defense, they were required to prove the following: 1) that McGregor, the geologist, made a false representation of, or concealed, material facts with regard to the 65.5 and 50 acre leases, 2) that he did so with actual or constructive knowledge of the fact 3) to the McAlpins, who were without knowledge or the means of knowledge of the real facts, 4) with the intention that the misrepresentation be acted on and 5) the McAlpins relied on or acted on it to their prejudice. *See Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 930 (1952).

The McAlpins direct our attention to the following purportedly fraudulent actions of McGregor: 1) that McAlpin offered him the 65.5 acre lease, but McGregor rejected it "for no reason," causing McAlpin to rely on that rejection and keep the lease for himself; 2) McGregor hired his own lease broker to acquire leases in the Woods Cemetery Field, in violation of the partnership agreement; and 3) McGregor acquired several leases in the Northern region to the exclusion of McAlpin, causing McAlpin to assume he could keep the 65.5 and 50 acre leases for himself.

In none of these three instances did McGregor fraudulently represent or conceal facts known to him. Viewing the evidence in the light most favorable to the jury's finding, we look solely to what McAlpin alleges were incidents of unclean hands, notwithstanding McGregor's version of the events. McAlpin contends that McGregor rejected the 65.5 acre lease for no reason, so he kept the lease for himself. However, at that time McAlpin was fully aware of McGregor's use of a new broker and his acquisition of additional properties. An argument quickly ensued as a result of everything McGregor told McAlpin, and the men jointly agreed to terminate the partnership. We find no evidence of concealment or fraudulent misrepresentation necessary to sustain the jury's finding of estoppel.

The trial court did not err by disregarding the finding that McGregor was estopped. There is no evidence of unclean hands to bar the imposition of the trust.

The trial court did not err by imposing a constructive trust in favor of all of the investors. Points five and six are overruled.

■ By points seven through nine, the McAlpins contend that the trial court erred by awarding the investors their attorney's fees under the Declaratory Judgment Act, Tex.Civ.Prac. & Rem.Code § 37.001, *et seq.* (Vernon 1986), because no relief was rendered under that Act, thus providing no basis for the award and rendering it improper. By point ten, the McAlpins maintain that the award was inequitable because the investors did not have clean hands. With regard to point ten, having determined that the trial court properly disregarded the jury's finding of estoppel, the assertion that the investors had unclean hands and therefore should not receive attorney's fees is without merit. Point ten is overruled.

The balance of the attorney's fees arguments center on whether the court's judgment was truly a declaration of the parties' rights, title and interest under the Joint Operating Agreement and the other agreements made between the parties. The McAlpins assert that no declaratory relief was granted at all and complain specifically of the judgment itself, contending that the parties' rights arose only by virtue of the other independent causes of action alleged, and that the agreements were not actually construed.

We disagree. The trial court's judgment conforms to a construction of the partnership agreement. While we have modified the judgment to reflect the proper interests held by the parties, the judgment did reflect the trial court's analysis of the agreements between the parties. The Declaratory Judgment Act was invoked here. The investors were properly awarded attorney's fees on that basis. Points 7 through 9 are overruled.

■ By points one through three, the McAlpins contend that the trial court erred by excluding the testimony of their expert witness because he was not properly designated. This witness was introduced for the purpose of supporting the McAlpins' coun-

terclaim, which asserted that due to this litigation, their titles to the 65.5 acre and 50 acre tracts were clouded, resulting in the loss of oil and gas from the leases and the diminution of their value. The expert was to testify about the fair market value of those leases. The investors objected to this testimony, maintaining that the witness had not been designated to give an opinion on the fair market value of the leases. The court sustained the objection, and the McAlpins put forth the proposed testimony via a bill of exceptions. The McAlpins assert that the trial court erred by refusing the testimony of the witness, contending that he was in fact properly designated to testify about the fair market value of these leases.

The burden is on the appellant to see that a sufficient record is presented to show error requiring reversal. TEX. R.APP.P. 50(d). After a careful review of the record, we find no Response to Interrogatories or the like included in it to substantiate the McAlpins' contention that they did properly designate this expert. There being no record indicating that the witness was properly designated, we overrule the first three points of error.

■■■ By two cross-points, the investors maintain that the trial court erred by setting aside the jury's award of $208,086.38 to them for actual damages sustained when they drilled the # 2 Post well on the Angela McAlpin 40–acre lease, resulting in a dry hole. The question read, "What sum of money, if any, would fairly and reasonably compensate Plaintiffs for their expenses in drilling the # 2 Post well?" The McAlpins filed a Motion for Judgment Non Obstante Veredicto, contending that the jury's answer was not supported by the evidence because the jury question did not ask whether McAlpin's conduct proximately caused the drilling of the dry hole. The court disregarded the jury's award in response. The investors maintain that the McAlpins waived any error in the jury's finding by not properly objecting to the proposed question at trial.

With regard to the waiver contention, the McAlpins did object to the wording of the question with specificity as required by TEX.R.CIV.P. 274. That Rule requires that any complaint about a question, definition or instruction, on account of any defect, omission, or fault in the pleading, is waived unless specifically included in the objections, and it must not be concealed or obscured by voluminous objections. The McAlpins' attorney objected to this question in the following manner:

> That question is not predicated on any finding of any issue in this charge and **there is no special issue asking the jury whether or not there was any reliance on the Plaintiff of any action by the McAlpins or any conduct on McAlpin's part** which would give rise to duty—no, excuse me, any action on McAlpin's part that would breach any duty that he had concerning the drilling of the Post # 2 well.

(emphasis added). This objection being specific and unobscured, the investors' waiver argument is without merit.

■■■ With regard to the court disregarding the jury's finding of actual damages in response to the McAlpins' motion for judgment n.o.v., to sustain a damage award, a plaintiff must receive a jury finding that the damages were causally linked to the wrongful act of the defendant. *Turner v. P V Int'l Corp.*, 765 S.W.2d 455, 464 (Tex. App.—Dallas 1988) *writ denied per curiam*, 778 S.W.2d 865 (1989) (addressing other issues). The McAlpins contended that without such a finding by the jury, the investors' actual damages award could not stand. The investors contend that such an issue was uncontroverted, and therefore need not have been submitted to the jury, pursuant to TEX.R.CIV.P. 301. We disagree. The McAlpins argued in their objection to the absence of a proximate cause issue:

> We believe the evidence is undisputed that the Post # 2 well was drilled solely at the Plaintiffs' election ...

The investors contend that McAlpin forced this drilling. The parties make clear from their completely opposite positions that a fact issue remained that should have been decided by the jury.

Finding the issue of whether McAlpin proximately caused the investors damage to be controverted, we hold that the issue should have been submitted to the jury. Consequently, the trial court did not err by disregarding the jury's finding of actual damages because there was no finding of proximate cause. The investors' cross-point is overruled.

The judgment of the trial court is MODIFIED to reflect the court's validation of the partnership agreement. McAlpin shall hold 87.5% of the leasehold interests in trust for the investors and McGregor, retaining his 12.5% partnership interest in those leases as designated by the breached partnership agreement. The judgment, as MODIFIED, is AFFIRMED.