**TEXSTAR NORTH AMERICA, INC., Appellant,**

v.

**LADD PETROLEUM CORPORATION, Appellee.**

No. 13-90-400-CV.

Court of Appeals of Texas, Corpus Christi.

May 16, 1991.

Rehearing Overruled June 12, 1991.

Bruce B. Kemp, Dillon J. Ferguson, Cheryl S. Phillips, Mayor, Day, Caldwell & Keeton, Houston, Scott F. Cline, Cline & Cline, Wharton, for appellant.

David E. Arnold, Daniel L. Ellwood, Pohl, Bennett & Mathews, Houston, Paul Webb, Wharton, for appellee.

**674**

Before NYE, C.J., and BENAVIDES and HINOJOSA, JJ.

## OPINION

NYE, Chief Justice.

This is an action for the alleged breach of a joint operating agreement between appellant, Texstar North America, Inc., and appellee, Ladd Petroleum Corporation. Texstar sued Ladd seeking temporary and permanent injunctions, a declaratory judgment and damages. Ladd filed a counterclaim against Texstar seeking a declaratory judgment and attorney's fees. The trial court granted summary judgment favorable to Ladd on Texstar's claims. After Ladd amended its counterclaim, the trial court granted summary judgment favorable to Texstar on Ladd's counterclaim. Texstar appeals by one point of error, and Ladd brings one cross-point. We affirm.

The evidence shows that in January, 1986, Ladd completed the Popp No. 1 Well, its discovery well in the El Campo Reservoir. Ladd then drilled the Kuehnle Well southeast of the Zalman tract. In February, 1987, Texstar completed the Zalman No. 1 Well 467 feet from the Zalman tract's south and east lines. (The Zalman No. 1 was as close to the Kuehnle and Popp Wells as the Texas Railroad Commission regulations permitted.) The Zalman No. 1 was drilled without Ladd's consent or participation. Ladd, Black Jack Resources, Inc. and Pelto Oil Company owned leases covering an undivided 11.25 percent interest in the minerals under the Zalman tract. By virtue of their ownership interests, these three companies became co-tenants with Texstar, entitling their interests to be carried without expense or penalty through payout and entitling them to share in the Zalman No. 1's revenues after it had paid out.

On or about July 31, 1987, Ladd completed the Mach Well. The Popp, Kuehnle, Mach and Zalman No. 1 Wells all produced hydrocarbons from the El Campo Reservoir. The Zalman No. 1 paid out in Au-

gust, 1987, and Texstar and Ladd then entered into a joint operating agreement (the "Agreement"). The Agreement became effective on November 1, 1987, and covered the Zalman tract as its contract area. The Agreement stated that Texstar was the operator and that Ladd was a non-operator. On December 1, 1989, and December 12, 1989, Texstar submitted a proposal to fracture stimulate the Zalman No. 1 in order to enhance its productive capacity. Ladd told Texstar that it would not consent to the fracture procedure. This lawsuit resulted.

On May 16, 1990, Texstar filed its "PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIONS" against Ladd and Black Jack.[1] Texstar alleged that Ladd's offset wells (the Popp, Kuehnle and Mach Wells) were draining the hydrocarbons that could be produced from the Zalman No. 1. By withholding their consent to fracture the well, the defendants were preventing Texstar and the other working interest owners in the Zalman No. 1 from exercising their right to produce additional minerals from the Zalman No. 1. Texstar alleged that Ladd's refusal to consent to the fracture procedure was in bad faith and violated the duty of mutual cooperation implied in the Agreement. According to Texstar, a reasonably prudent operator would fracture the well, and the working interest owners would agree to the procedure. Texstar then requested a temporary injunction enjoining defendants from producing gas and condensate from the offset wells, or, alternatively, a temporary injunction compelling the defendants to consent to the fracture procedure, a declaration that the defendants' refusal to consent to the fracture procedure is a breach of their implied duty of mutual cooperation under the Agreement, a permanent injunction compelling the defendants' consent to the fracture procedure, actual damages, and attorneys' fees and costs.

---

1. Subject to a non-suit dated July 13, 1990, all of Texstar's claims against Black Jack were dismissed.

On June 11, 1990, Ladd filed its "DEFENDANT'S ORIGINAL ANSWER AND COUNTERCLAIM." On June 22, 1990, Ladd moved for summary judgment on Texstar's claims. It asserted that the evidence and Texas common law establish, as a matter of law, that the "Agreement" controlled the exercise of the non-consent rights to a rework procedure. Ladd asserted that it had not breached any of the Agreement's terms in exercising its non-consent rights to the fracture procedure.

Ladd's summary judgment evidence consisted of the affidavits of Gary Burns, William Goetz and Judd Hansen, deposition excerpts from J.W. Rhea, Thomas Gaylord, C.D. Gaines and Dennis McKee, a copy of the Agreement, a copy of Texstar's proposal, and a copy of a letter from Ladd to Texstar.

Article VI.B.1 of the Agreement stated, in relevant part:

1. *Proposed Operations:* Should any party herein desire to drill any well on the Contract Area, or to rework, deepen or plug back a dry hole not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. . . .

Article VII.D.2 stated, in relevant part:

2. *Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back,* except a well reworked or plugged back pursuant to the provisions of Article VI.B.2 of this agreement. Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.[2]

Texstar's proposal indicated that the Zalman No. 1 was approximately 45 percent depleted, had a useful life of seventeen years and had recoverable reserves of 1,950,000 million cubic feet (mcf) of gas and 233,000 barrels of condensate (boc). The proposed fracture should increase the daily rate of production from 800,000 mcf and 100 boc to three MM cubic feet of gas and 360 boc, increase recoverable reserves from 1.958 BCF of gas and 233,000 boc to 4.575 BCF of gas and 544,400 boc, realize a payout of the fracture costs in three-and-one-half months, and realize an internal rate of return of 350+ percent (maximum limits of program) and a return on investment of 12.6 to 1.

William Goetz, Ladd's production manager, stated that the proposed fracture is a rework procedure and that the Zalman No. 1 was producing in paying quantities on December 1, 1989, and continued to produce in paying quantities up to the date of his affidavit, June 21, 1990. He reviewed an analysis of the advantages and disadvantages of the proposed fracture prepared by Ladd engineers. He said that the analysis advanced several mechanical, economic, technical and geological risks associated with the fracture. These risks, combined with the Agreement's terms, caused him to recommend to Ladd that it not consent to the proposed fracture. Ladd's concerns about the proposed fracture were communicated to Texstar before Texstar filed suit. Gary Burns, a Ladd landman, negotiated several terms of the Agreement with Texstar representatives.

C.D. Gaines, a Texstar employee, stated that he assessed the fracture proposal. He said that there was a risk that the fracture could cause a loss of the well. Dennis McKee, a Halliburton Services' employee (Halliburton was the company that prepared the proposal), stated that Texstar had a 70 to 80 percent chance of success if it did not hit a fault.

J.W. Rhea, Texstar's vice-president, stated that as of June 4, 1990, the Agreement was in force and that the Zalman No. 1 was producing in paying quantities. He said that the proposed fracture was a rework procedure, as that term is used in the Agreement and that Article VII.D.2 governed the proposed fracture. He agreed

---

2. Emphasis supplied throughout.

**676**

that under this article, a well, which is producing in paying quantities, cannot be reworked without the consent of all parties to the Agreement. An existing fault was a negative for the proposed fracture, but a prudent operator would take the risk and complete the fracture. The proposed fracture had a 75 percent or greater chance of success. Rhea was of the opinion and believed that Ladd, by withholding its consent, was acting in bad faith.

Texstar responded further and asserted that working interest owners, under these circumstances, owe each other the duty of mutual cooperation and the duty of good faith and fair dealing. Ladd's refusal to consent to the proposed fracture was a breach of these duties. Texstar's evidence consisted of the deposition excerpts of Dennis McKee, Gary Burns, William Goetz and Aaron Pierce, and the affidavit of J.W. Rhea.

Gary Burns stated that Ladd had a problem with drainage should production in the Zalman No. 1 be increased. Ladd had a 72.5 percent working interest share in the Mach and Kuehnle Wells and a 50.75 percent working interest share in the Popp Well (The Agreement shows that Ladd had an 8.15625 percent working interest share in the Zalman No. 1). If the Zalman No. 1's production was increased, it could potentially drain hydrocarbons from Ladd's acreage. Burns also stated that the proximity of a fault to the Zalman No. 1 is the reason for Ladd's failure to participate in the fracture procedure. According to Burns, it is in the mutual interest of all the working interest owners to have a well produce at optimum efficiency, and to have a well produce, as efficiently as possible, the maximum hydrocarbons from its reservoir.

William Goetz stated that a bottom-hole pressure test was performed on the Zalman No. 1. Aaron Pierce reviewed the test's results and stated that a fault does not exist within 255 feet of the Zalman No. 1's well bore. Dennis McKee stated that if Halliburton knew that it would encounter a fault in the Zalman No. 1's well bore, this would not greatly change the proposal to

fracture the well. He said that precautions must be taken as the fracture proceeds.

J.W. Rhea stated that Ladd is the operator of the Popp, Mach and Kuehnle Wells. These wells produce at a rate up to ten times greater than the Zalman No. 1. The Ladd wells drain the reserves which could be recovered by the Zalman No. 1. All parties to the Agreement have consented to the proposed fracture except Ladd.

On July 18, 1990, the trial court granted summary judgment favorable to Ladd. On August 3, 1990, Texstar filed a summary judgment motion concerning Ladd's counterclaim. Texstar contended that, as a matter of law, it is entitled to summary judgment because Ladd's counterclaim sought no affirmative relief other than a declaration that Ladd is not liable for Texstar's claims. Texstar contended that the summary judgment against Texstar resolved all of the disputed issues between the parties.

On August 16, 1990, Ladd filed its "DEFENDANT'S FIRST AMENDED COUNTERCLAIM." On August 24, 1990, the trial court entered summary judgment favorable to Texstar, ordering that Ladd take nothing by its counterclaim. In reviewing a summary judgment record, this court must determine whether a disputed material fact issue exists that would preclude a summary judgment for either party. *Gonzalez v. Mission American Insurance Co.*, 795 S.W.2d 734, 736 (Tex.1990); *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984). Every reasonable inference must be indulged in the non-movants' favor, and any doubt resolved in their favor. *Wilcox v. St. Mary's University*, 531 S.W.2d 589, 593 (Tex.1975). The question on appeal is not whether the summary judgment proof raises a fact issue with reference to the essential elements of the plaintiff's cause of action, but whether the summary judgment proof establishes that the movant is entitled to summary judgment as a matter of law. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970); *Tucker v. Atlantic Richfield Co.*, 787 S.W.2d 555, 557 (Tex.App.—Corpus Christi 1990, writ denied).

By its sole point of error, Texstar complains that the trial court erred by granting Ladd's summary judgment. Texstar concedes that the Agreement does not expressly impose any restrictions on the working interest owners' right to refuse consent to proposed rework operations. Texstar's contention is that even though the Agreement is silent on this point, it does not expressly permit a bad faith exercise of this right. In construing a written contract, the court's primary concern is to ascertain the parties' true intentions as expressed in the instrument itself. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 543 (Tex.App.—Corpus Christi 1989, writ denied). All provisions in a contract must be considered with reference to the whole instrument. *Coker*, 650 S.W.2d at 393; *First Victoria National Bank v. Briones*, 788 S.W.2d 632, 634 (Tex.App.—Corpus Christi 1990, writ denied); *Corriveau v. 3005 Investment Corp.*, 697 S.W.2d 766, 767 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). If the written instrument is so worded that it can be given a certain definite meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker*, 650 S.W.2d at 393; *Huggins*, 765 S.W.2d at 543; *Corriveau*, 697 S.W.2d at 767. A court should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served. *Reilly*, 727 S.W.2d at 530.

Language used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. *Reilly*, 727 S.W.2d at 529; *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985). When construing the terms of an instrument, we will presume that they will be given their plain, ordinary and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense. *Milton v. Aransas Shrimp Co-op.*, 668 S.W.2d 735, 739 (Tex.App.—Corpus Christi 1983, writ dism'd).

In the present case, the Agreement is unambiguous. Articles VI.B.1 and VII.D.2 expressly provided the terms and conditions that had to exist before a well could be reworked. This alone suggests that the rework provisions should be enforced according to their terms. *See e.g., Triangle Mining Co. v. Stauffer Chemical Co.*, 753 F.2d 734, 739 (9th Cir.1985); *Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944 (Tex.1984).

The undisputed facts show that Texstar proposed to fracture stimulate the Zalman No. 1 while it was producing in paying quantities. The fracture procedure is considered to be a "rework" procedure, as that term is used in the Agreement. Article VII.D.2 governed the proposed fracture procedure. This article provided, in relevant part, that "[w]ithout the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2 of this agreement...." Article VI.B.2 concerned wells that were not producing in paying quantities. Therefore, under these circumstances, Texstar needed Ladd's consent before it could fracture stimulate the Zalman No. 1.

Texstar argues that summary judgment is not appropriate for two reasons: (1) working interest owners have an implied duty of mutual cooperation for the common benefit of all; and (2) the relationship between working interest owners is fiduciary in character, and accordingly, the parties owe each other a duty of utmost good faith and fair dealing. The Texas Supreme Court expressly rejected the notion that an implied duty of good faith and fair dealing exists in every contract in *English v. Fischer*, 660 S.W.2d 521 (Tex.1983). Such a duty is recognized only when there is a "special relationship" between the parties to the contract. *See Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex.1984); *Fischer*, 660 S.W.2d at 524–25.[3] In *Exxon*

---

**3.** Texas courts have concluded such a "special relationship" exists between insurer and in-

*Corp., supra,* the Texas Supreme Court reaffirmed *English,* stating (citations omitted): "There can be no implied covenant as to a matter specifically covered by the written terms of the contract. The agreement made by the parties and embodied in the contract itself cannot be varied by an implied good-faith-and-fair-dealing covenant." *Exxon Corp.,* 678 S.W.2d at 947. Texstar's reliance upon an implied duty of good faith and fair dealing is without merit in this case.

Texstar admits that no Texas case law supports its position that an implied duty of mutual cooperation exists between working interest owners who are parties to a joint operating agreement. *See, e.g., Exxon Corp.,* 678 S.W.2d at 947; *Tejas Grain Makers, Inc. v. Cactus Feeders, Inc.,* 762 S.W.2d 734, 737 (Tex.App.—Amarillo 1988, no writ). In the instant case, Articles VI.B.1 and VII.D.2 expressly and unambiguously set out the terms under which a party to the Agreement could withhold consent to a rework procedure. There can be no implied covenant to the contrary. We hold that the trial court did not err by granting summary judgment favorable to Ladd on Texstar's claims. Texstar's sole point of error is overruled.

By a sole cross-point, Ladd complains that the trial court erred in granting summary judgment on its counterclaim. Ladd contends that its "DEFENDANT'S FIRST AMENDED COUNTERCLAIM" encompassed issues beyond those already before the trial court in Texstar's "PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIONS."

In its amended counterclaim, Ladd stated that it brought this action under the Uniform Declaratory Judgments Act (the "Act") [4] to obtain a declaration of the rights, status and legal relations of the parties concerning present or future proposals to rework, deepen or plug back the

Zalman No. 1 under Articles VI.B.1 and VII.D.2 of the Agreement. Ladd further brought this amended counterclaim under § 37.009 of the Act to obtain its attorney's fees expended in defending Texstar's claims. Ladd restated this latter demand as follows: "In the alternative, and as a separate basis for relief, Counter–Plaintiff Ladd brings this Counterclaim to recover reasonable and necessary attorney's fees from Texstar incurred in the defense of Texstar's claims." Ladd requested that the trial court issue a declaratory judgment construing the rights, status and legal relations of the parties to exercise their nonconsent election with regard to *any proposed* reworking, deepening, or plugging back operations under the Agreement and the right of Texstar or *any subsequent operator* to commence any reworking, deepening or plugging back operations on the well without consent of all parties while the well is producing in paying quantities.

In its prayer for relief, Ladd requested a declaratory judgment: (1) that the express terms of Article VI.B.1 and VII.D.2 unambiguously permit it to withhold consent to *any proposed* rework operation and to *other proposals* to rework, deepen or plug back the well while it is capable of producing in paying quantities; and (2) that the operator shall not commence *any reworking,* deepening or plugging back operations on the well, without the consent of all the parties to the Agreement, so long as it produces in paying quantities. Ladd also requested its attorney's fees and costs through trial of its counterclaim, plus $5,000.00 in attorney's fees if Texstar unsuccessfully appealed to the court of appeals, and $5,000.00 in attorney's fees if Texstar unsuccessfully appealed to the Texas Supreme Court.

The Declaratory Judgments Act is not available to settle disputes currently pending before a court. *BHP Petroleum Co. v. Millard,* 800 S.W.2d 838, 841

---

sured, *see Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987), a workers' compensation insurer and its insured, *see Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 212–213 (Tex.1988), and executive rights holders in a mineral estate and holders of non-

executive working interests, *see Guerra,* 673 S.W.2d at 183.

**4.** *See* Tex.Civ.Prac. & Rem.Code Ann. §§ 37.-001–37.011 (Vernon 1986 & Supp.1991).

(Tex.1990). A justiciable controversy must exist between the parties before a declaratory judgment action will lie. *California Products, Inc. v. Puretex Lemon Juice, Inc.*, 334 S.W.2d 780, 781 (Tex.1960); *El Paso Natural Gas v. American Petrofina Co.*, 733 S.W.2d 541, 554 (Tex.App.—Houston [1st Dist.] 1986, no writ). A justiciable controversy does not exist where an advisory opinion is being sought if a party requests a court to render a declaratory judgment premised upon the occurrence of a future, hypothetical event. *Stop'n Go Markets v. Executive Security Systems, Inc.*, 556 S.W.2d 836, 837 (Tex.Civ.App.—Houston [14th Dist.] 1977, no writ).

In the instant case, Ladd brought its counterclaim, in part, to obtain a declaration of the rights, status and legal relations of the parties (or a subsequent operator) concerning *present or future proposals* to rework, deepen or plug back the Zalman No. 1. The fracture stimulation procedure is a present proposal already pending before the court. Any future proposals do not create a justiciable controversy. The cross-point is overruled.

Section 37.009 provides that (emphasis ours) "[i]n *any proceeding* under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." The grant or denial of attorney's fees in a declaratory judgment action lies within the sound discretion of the trial court. Its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.*, 794 S.W.2d 442, 448 (Tex.App.—Corpus Christi 1990, writ denied); *District Judges of Collin County v. Commissioners Court of Collin County*, 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Ladd makes no showing that the trial court abused its discretion in this case or that the trial court's failure to award attorney's fees is not equitable or just. We hold that the trial court did not err by granting summary judgment favorable to Texstar on Ladd's counterclaim.

The trial court's judgment is AFFIRMED.

BENAVIDES, J., not participating.