Opinion filed November 30, 2006















 
 
  
 
 







 
 
  
 
 




Opinion filed November 30, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-06-00244-CV 

                                                    __________

 

                           IN RE GREAT WESTERN DRILLING, LTD.

 



 

                                                Original
Mandamus Proceeding

 



 

                                                                   O
P I N I O N

 

This is a mandamus proceeding complaining of the
trial court=s order
compelling the parties to attend binding arbitration.  Great Western Drilling, Ltd. filed a
declaratory judgment action against several working interest owners seeking a
declaration regarding the parties=
relative rights, duties, and obligations concerning a property described as the
NE Linker Prospect.  Great Western also
sought a declaration that arbitration provisions in two joint operating
agreements did not apply to this dispute. 
Pathfinder Oil & Gas, Inc. intervened in the litigation and sought
similar declaratory relief.

The working interest owners asked the trial court
to compel arbitration and stay the litigation. Great Western responded with a
motion to stay arbitration, conduct an evidentiary hearing, and compel
discovery.  The trial court granted the
working interest owners=
request, ordered the parties to arbitration, and stayed the litigation.  Great Western filed a petition for writ of
mandamus with this court. The writ is conditionally granted.

 








                                                              I.
Background Facts

Great Western, Pathfinder, and the working
interest owners entered into a letter agreement to develop a prospect referred
to as the ALatigo
Project.@  The agreement required the drilling and
completion of an initial test well in the Strawn formation and the reentry of
the Jackson No. 1 well to test the Lower Clearfork
formation.  Both wells were designated
obligatory wells.  The agreement
contemplated drilling optional wells in areas referred to as the Linerider
Prospect and the South Levelland Prospect.

The letter agreement required the parties to
execute a 1989 A.A.P.L. model form joint operating agreement (JOA) naming Great
Western as the operator for the Strawn and Lower Clearfork
reservoirs.  Two JOAs were executed.  One governed the Latigo Prospect - Strawn
Prospects, and the other governed the Latigo Prospect - Jackson Lower
Clearfork.  Both agreements included the
model form=s
liability limiting paragraph.[1]  The parties added their own area of mutual
interest (AMI) provision, arbitration provision, and confidentiality
provision.  Both JOAs defined the AContract Area@
to Amean all of the lands, Oil and Gas
Leases and/or Oil and Gas Interests intended to be developed and operated for
Oil and Gas purposes under this agreement,@
and both included an exhibit listing the leases.








The Texas Supreme Court defined an AMI as an Aagreement [in which] the parties
attempt to describe a geographic area within which they agree to share certain
additional leases acquired by any of them in the future.@  Westland Oil Dev. Corp. v. Gulf Oil Corp.,
637 S.W.2d 903, 905 (Tex.
1982).  The JOAs defined the AMI contract
area as the acreage shown within a bold outline on an attached plat and
provided that Athe
outline on said plat shall be considered a line having no width, running along
the nearest boundary line of any separately surveyed section or labor appearing
on said plat.@  Any party acquiring or proposing to acquire
certain interests in the contract area within three years of the date of the
letter agreement was required to give notice of the acquisition and its terms
to all other parties who then had thirty days to decide if they wished to
participate.[2]

The JOAs=
arbitration and confidentiality provisions read as follows:

P.         Arbitration.  Any
dispute, controversy or claim arising out of or relating to this Agreement or
the breach or validity thereof (ADispute@) shall be referred to and finally
settled by final and binding arbitration in Houston, Harris County, Texas.  The term AAgreement@ includes the contract itself and all
exhibits and attachments. . . . Upon the request of any party, whether made
before or after the institution of any legal proceedings, any Dispute shall be
resolved by binding arbitration by three arbitrators.  The parties agree to use the Commercial
Arbitration Rules of the American Arbitration Association and, to the maximum
extent possible, the Federal Arbitration Act (Title 9 of the United States
Code). . . . The transactions contemplated by this Agreement are transactions
involving or related to commerce. . . . The arbitrators shall not have the
authority to award, and the tribunal shall not award, any damages or
compensation for loss of prospective profits or special, indirect or
consequential damages, punitive damages, or exemplary damages in connection
with any Dispute, or any attorney=s,
expert witness, or other such fees or costs.

 

Q.        Each party hereto agrees that all data and information
acquired pursuant to this Agreement shall be confidential and shall not be
disclosed by them to any person or corporation who is not a party to this
Agreement without the prior written consent of the other parties for a period
of three (3) years from the date hereof.

 








In 2004, Great Western acquired oil and gas leases
in Labors 1 and 10 of League 29, Hockley
 County, Texas, for a
project named the NE Linker Prospect. 
The NE Linker Prospect was not included in either JOA=s contract area or area of mutual
interest, but it was adjacent to the Latigo - Strawn Prospect JOA=s AMI contract area.  Great Western did not offer the working
interest owners an opportunity to participate in this acquisition.  The working interest owners contend that they
did not know Great Western was acquiring the offsetting leases and that its
acquisition was motivated by geological information which they helped pay to
develop.

Also in 2004, Great Western proposed drilling a
well known as the Airfield No. 2.  This
well was in the Latigo-Strawn Prospect JOA=s
contract area, near the eastern boundary of the Latigo Project.  The Gulf Group and Santa Rosa alleged that they separately
contacted Great Western because of their concern about the lack of offset
acreage and were both told not to worry because Great Western was acquiring
acreage and would handle the land aspects of the matter.

In 2005, Great Western drilled and completed two
commercially successful wells in the NE Linker Prospect.  The working interest owners describe these as
offset wells and contend that they were completed in the Lower
 Clearfork B
which is the same formation from which the Airfield No. 2 is producing B 
and that the offset wells have reserves worth several million dollars.  In 2006, they filed a demand for arbitration
and requested the opportunity Ato
participate in properties developed as a direct result of the investment made
by them in the Latigo Project.@

The working interest owners stated in the
contentions section of their Arbitration Statement that Great Western and
Pathfinder owed fiduciary, contractual, and common law duties to them and that:

Pathfinder and Great Western ignored their duty to
keep all information acquired during the parties=
venture confidential.  They ignored their
duty to use information bought and paid for the (sic) by the venture only in
matters that were in the best interests of the venture=s
members.  They used the information to
acquire offsetting acreage solely for their own benefit.  These actions amount to breach of contract,
breach of fiduciary duty and fraud.

 

The working interest owners requested monetary damages, an
assignment of the interests they would have received but for Pathfinder and
Great Western=s
wrongful actions, and a judgment directing Pathfinder and Great Western to
disgorge all profits made as a result of their fraud, breach of fiduciary duty,
and breach of contract.

                                                                       II.
Issues

Great Western=s
petition presents five issues:

1.  Is mandamus available to review an order
compelling arbitration?

2.  Did the trial court abuse its discretion in
ordering arbitration?








3.  Did the trial court abuse its discretion by
refusing to conduct an evidentiary hearing?

4.  Did the trial court abuse its discretion in
refusing to compel discovery on disputed fact issues relating to the scope of
the arbitration agreements?

5.  Does Great Western have an adequate remedy at
law?

 

                                                            III.
Standard of Review

The arbitration clauses provide that the Federal
Arbitration Act (FAA)[3]
applies to the maximum extent possible. 
When Texas courts are called on to decide if disputed claims fall within
the scope of an arbitration clause under the FAA, Texas procedure controls that
determination. In re Champion Techs., Inc., 173 S.W.3d 595, 598 (Tex.
App.CEastland
2005, no pet.).

We review orders compelling arbitration under the
FAA for an abuse of discretion.  Jack
B. Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992).  A trial court abuses its discretion if it
acts without reference to any guiding rules or principles or acts in an
arbitrary or unreasonable manner.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).  When reviewing matters committed to a trial
court=s
discretion, an appellate court may not substitute its own judgment for that of
the trial court.  Walker v. Packer,
827 S.W.2d 833, 839 (Tex. 1992).  Nor may
a reviewing court set aside the trial court=s
determination unless it is clear from the record that the trial court could
only reach one decision.  Id. at
840.  








The trial court=s
interpretation of the arbitration agreement itself is a legal question subject
to de novo review.  See J.M. Davidson,
Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003). Arbitration agreements
are interpreted under traditional contract principles.  Id. 
Our primary concern is to ascertain the true intentions of the parties
as expressed in the instrument.  R
& P Enters. v. La Guarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518
(Tex. 1980).  We examine and consider the
entire writing in an effort to harmonize and give effect to all the provisions
of the contract so that none will be rendered meaningless.  Universal C. I. T. Credit Corp. v. Daniel,
243 S.W.2d 154, 158 (Tex. 1951).  No
single provision taken alone will be given controlling effect.  All the provisions must be considered with
reference to the whole instrument.  Myers
v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196 (Tex. 1962).  The contracts are construed from a
utilitarian standpoint, bearing in mind the particular business activity sought
to be served.  Reilly v. Rangers
Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987).

                                                       IV. Discussion

A.  Is
Mandamus Available?

The working interest owners contend initially
that, because the arbitration agreement is subject to the FAA, the trial court=s order compelling arbitration is not
reviewable by mandamus.  The Texas
Supreme Court recently addressed this issue in In re Palacios, No.
05-0038, 2006 WL 1791683 (Tex. June 30, 2006). 
There, the court noted that an order denying arbitration under the FAA
is reviewable by mandamus but that federal courts did not allow the review of
an order compelling arbitration until the entry of a final judgment.  Id. at *2. Here, the trial court
compelled arbitration and stayed the litigation rather than dismissing it.  Therefore, as discussed in Palacios,
because there is no final judgment, because the trial court compelled
arbitration rather than denying it, and because the litigation was stayed
rather than dismissed, mandamus normally would be inappropriate.

However, the court stopped short of saying
mandamus is never available when the litigation is merely stayed.  The court noted that the Fifth Circuit
allowed mandamus review if a party could Ashow
>clearly and indisputably that the
district court did not have the discretion to stay the proceedings pending
arbitration.=@ Id. (quoting Apache Bohai
Corp., LDC v. Texaco China, B.V., 330 F.3d 307, 310 (5th Cir. 2003)).  Because the court concluded that the relator
had not met this Aparticularly
heavy mandamus burden,@
it denied the petition for mandamus.  Id.

Although the court did not specifically hold that
orders compelling arbitration are reviewable by mandamus, its analysis suggests
that mandamus relief was possible if the relator had satisfied this heightened
burden of proof.  We will, therefore,
review the record to determine if Great Western has demonstrated clearly and
indisputably that the trial court lacked the discretion to stay the proceedings
pending arbitration.  Great Western=s first and fifth issues are sustained.

B.  Did the Trial Court
Abuse Its Discretion by Not Providing for an Evidentiary 

            Hearing or Allowing Limited
Discovery?

 








This court has previously recognized that trial
courts are required to summarily decide motions to compel arbitration.  See Champion Techs., 173 S.W.3d
595.  In that case, the trial court
deferred ruling on a motion to compel arbitration to allow the parties time to
conduct discovery.  We noted that the
expedited disposition of a dispute is one of arbitration=s
primary benefits and that the legislature has mandated expedited consideration
of motions to compel arbitration.  Id.
at 599.  Delaying a decision on a
motion to compel arbitration until after discovery is completed, we found,
defeated the goal of resolving arbitration issues promptly.  Accordingly, we determined that the trial
court abused its discretion by deferring a ruling until after the completion of
discovery.

Great Western served requests for disclosure and
requests for production on the working interest owners and asked them to tender
fact witnesses with personal knowledge of the claims in the arbitration
demand.  Great Western contended this
discovery was necessary to determine whether arbitration should be stayed or
compelled.  The record does not contain
copies of the requests for production, the identity of the requested witnesses,
or any description of the witnesses=
expected testimony.  In light of this,
and the requirement that arbitration issues be summarily decided, we cannot say
the trial court abused its discretion by denying any discovery.

Great Western also requested an evidentiary
hearing to determine if the challenged wells were within the JOAs= AMI contract area, to determine if
verbal representations attributed to it were in fact made, and to determine the
basis for the working interest owners=
allegation that it breached the JOAs=
confidentiality provision.  Great Western
did not make a bill of exception.  Tex. R. App. P. 33.2.  Furthermore, Great Western=s evidentiary requests largely go to
the merits rather than the scope of the arbitration agreement.  Accordingly, we cannot say that the trial
court abused its discretion by not conducting an evidentiary hearing.  Great Western=s
third and fourth issues are overruled.  

C.    Is This Dispute Within the Scope of the
Arbitration Agreement?

1.  Determining
the Scope of an Arbitration Provision.

Courts, rather than arbitrators, decide whether
and what issues a party can be compelled to arbitrate.  Pennzoil Exploration & Prod. Co. v.
Ramco Energy Ltd., 139 F.3d 1061, 1066 (5th Cir. 1998).  This requires that we determine if the
parties= dispute
is within the scope of their arbitration agreement, which is a question of law
that we review de novo.  Associated
Glass, Ltd. v. Eye Ten Oaks Invs., Ltd., 147 S.W.3d 507, 512 (Tex. App.CSan Antonio 2004, no pet.). 








In making this determination, the merits of a
claim are immaterial.  See Universal
Computer Sys., Inc. v. Dealer Solutions, L.L.C., 183 S.W.3d 741, 749 (Tex.
App.CHouston
[1st Dist.] 2005, pet. denied) (even if it appears that a party=s claim is frivolous, trial courts may
not rule on the potential merits of a claim when determining whether the
parties have agreed to submit an issue to arbitration).  However, we do consider the terms of the
arbitration agreement and the factual allegations pertinent to the claim.  In re FirstMerit Bank, N.A., 52 S.W.3d
749, 754 (Tex. 2001).

A party seeking to compel arbitration under the
FAA must establish that there is a valid arbitration clause and that the claims
raised fall within its scope.  Id. at
753.  The first element includes gateway
matters such as whether a valid arbitration clause exists and whether an
arbitration clause is binding on a nonparty. 
In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex. 2005).  Great Western does not contend the agreement
is invalid.  Its challenge is directed at
the second element, contending that, because the disputed wells were drilled
outside the AMIs= contract
area, the arbitration agreement does not apply.

The scope of an arbitration clause is governed by
federal law.  Kirby Highland Lakes
Surgery Ctr., L.L.P. v. Kirby, 183 S.W.3d 891, 896 (Tex. App.CAustin 2006, no pet.).  Arbitration is a matter of contract between
the parties.  A court cannot compel a
party to arbitrate a dispute beyond the scope of its arbitration
agreement.  AT&T Techs., Inc. v.
Commc=ns
Workers of Am., 475 U.S. 643, 648 (1986).[4]  However, the law favors arbitration, and our
construction of the agreement must reflect this.  A[A]s
with any other contract, the parties=
intentions control, but those intentions are generously construed as to issues
of arbitrability.@  Mitsubishi Motors Corp. v. Soler
Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).








The parties=
arbitration provision is broadly written and applies to any dispute,
controversy, or claim arising out of or relating to the JOA.  Courts have held that similar language can
encompass a wide range of claims.  See,
e.g., Acevedo Maldonado v. PPG Indus., Inc., 514 F.2d 614, 616 (1st Cir.
1975) (arbitration provision applying to Aany
controversy or claim arising out of or relating to this Agreement or the breach
thereof@ covered
contract-generated or contract-related disputes however labeled); Valero
Energy Corp. v. Teco Pipeline Co., 2 S.W.3d 576, 589 (Tex. App.CHouston [14th Dist.] 1999, no pet.)
(claims for diversion of business opportunities, discounting services to
customers for personal benefit, and usurping opportunities for pipeline
interconnects and facilities were subject to arbitration); Dallas Cardiology
Assocs., P.A. v. Mallick,  978 S.W.2d
209, 214 (Tex. App.CTexarkana
1998, pet. denied) (claims of tortious interference with contract and
defamation subject to arbitration).

The Waco Court recently considered a similar
provision in Dennis v. College Station Hosp., L.P., 169 S.W.3d 282 (Tex.
App.CWaco
2005, pet. denied).[5]  The court wrote that a dispute was within the
agreement=s scope Aif the facts alleged >touch matters,= have a >significant
relationship= to, are >inextricably enmeshed= with, or are >factually
intertwined= with the
contract that is subject to the arbitration agreement.@  Id. at 285 (quoting Pennzoil Co. v.
Arnold Oil Co., 30 S.W.3d 494, 498 (Tex. App.CSan
Antonio 2000, no pet.)).[6]  The Waco Court held that an arbitration
request should not be denied Aunless
it can be said with positive assurance that an arbitration clause is not
susceptible of an interpretation which would cover the dispute at issue.@ 
Id. at 286.

Other courts have taken a more restrictive
approach when tort claims are asserted and arbitration is sought under a
contractual provision.  In Associated
Glass, 147 S.W.3d at 513, the court held:

If
a tort claim is so interwoven with the contract that it cannot stand alone, it
falls within the scope of an agreement to arbitrate; if, on the other hand, a
tort claim is completely independent of the contract and could be maintained
without reference to the contract, it falls outside the scope of an agreement
to arbitrate.

 

Accord Loy v. Harter, 128 S.W.3d 397, 403 (Tex. App.CTexarkana 2004, pet. denied); Teco
Pipeline, 2 S.W.3d at 590; Valero Energy Corp. v. Wagner &
Brown, 777 S.W.2d 564, 566 (Tex. App.CEl
Paso 1989, writ denied).








There is some common ground between these two
approaches.  First, the dispute need not
be a contractual claim or arise under the contract for an arbitration clause in
the contract to apply.  For example, an
allegation that the contract itself B
as opposed to the arbitration provision B
was fraudulently induced was a matter to be decided by the arbitrator in Henry
v. Gonzalez, 18 S.W.3d 684, 691 (Tex. App.CSan
Antonio 2000, pet. dism=d
by agr.).[7]  See also Associated Glass, 147 S.W.3d
at 513 (arbitration agreement applied to tort claims because they arose out of,
or were related to, alleged contractual duties to build and repair buildings).

Second, courts have routinely examined separate
agreements executed contemporaneously, by the same parties, for the same
purposes, and as part of the same transaction, together.  See, e.g., Pers. Sec. & Safety Sys.
Inc. v. Motorola Inc., 297 F.3d 388, 393 (5th Cir. 2002); Kirby Highland
Lakes Surgery Ctr., 183 S.W.3d at 901-02 (court considered both a purchase
and sale agreement and a partnership agreement when determining scope of
arbitration agreement even though the arbitration provision was in the
partnership agreement and the plaintiffs=
claim was based solely upon the purchase and sale agreement).  But cf. Perlstein v. D. Steller 3, Ltd.,
109 S.W.3d 36, 41-42 (Tex. App.CCorpus
Christi 2003, pet. denied) (parties executed three agreements as part of the
same transaction, but different agreements had different dispute resolution
provisions; therefore, arbitration clause in one agreement did not apply to all
disputes relating to the transaction).

Third, the nature of the parties= relationship is critical.  If their sole relationship is established and
governed by an agreement with an arbitration provision, their disputes are more
likely to fall within the scope of the arbitration provision.[8]  But when the relationship extends beyond the
agreement or is governed by separate and independent agreements, arbitration is
less likely.  See, e.g., Loy, 128
S.W.3d at 397 (arbitration provision in employment agreement did not apply to
claims arising from plaintiff=s
duties as a director).

However, courts are also in agreement that even
broad arbitration provisions have their limits. 
See Pennzoil Exploration, 139 F.3d at 1067 n.8; see also Neal
v. Hardee=s Food
Sys., Inc., 918 F.2d 34, 36-37 (5th Cir. 1990) (even broadly drafted
provision did not reach any and all disputes between the parties).








2.  Arbitration
of Oil and Gas Agreements.

The Fifth Circuit considered the scope of an
arbitration agreement in the context of oil and gas developmental activities in
Pennzoil Exploration, 139 F.3d 1061. 
In that case, there were numerous agreements concerning the development
of oil and gas reserves in the Apsheron Trend, an area located in the Caspian
Sea offshore Azerbaijan.  The agreements= signatories varied, as did their
purpose and scope.  Some, but not all,
included arbitration provisions.  The
dispute was between Ramco and Pennzoil over rights in a Karabakh Prospect
granted to Pennzoil by the Azerbaijan Government to satisfy obligations arising
from work performed on a gas utilization project.  Pennzoil refused to share any of these rights
with Ramco.  The court held that their
dispute was subject to arbitration clauses in a JOA and an AMI.  Id. at 1069-70. 

The JOA and AMI covered the Apsheron Trend.  Id. at 1063-64.  Both agreements included arbitration
provisions.  The interest conveyed by the
Azerbaijan government to Pennzoil in the Karabakh Prospect was outside the
Apsheron Trend and thus outside the contract area of both agreements.  Id. at 1064.

The court found that the JOA=s and AMI=s
arbitration provisions still applied because the JOA and AMI were part of a
transaction involving several interrelated and interdependent agreements to
secure developmental rights from the Azerbaijan Government.  The gas utilization project, for which
Pennzoil received its interest in the Karabakh Prospect, was a key factor in
this transaction.  It, and developments
directly tied to that project, led to the execution of the subsequent agreements
including the JOA and AMI.  Id. at
1069.  Consequently, notwithstanding the
geographical restriction, the court found that the dispute was related to the
JOA and AMI and was, therefore, subject to their arbitration clauses.

3.  The
Parties= Arbitration
Agreement.








The record is absent any indication that the
parties have a relationship beyond that created and governed by their letter
agreement and the JOAs.  Even though the
disputed wells are outside the contract areas of the parties= agreements, the working interest
owners make allegations which arguably are connected to their operation.  The Gulf Group and Santa Rosa contend that,
while circulating an AFE for the Airfield No. 2 (which is an activity
specifically governed by the JOAs), the question of offsetting acreage was
raised and promises were made by Great Western. 
The working interest owners allege further that Great Western=s decision to pursue leases in Labors 1
and 10 was motivated by geological information they helped pay to develop.  The letter agreement refers to geological and
3-D seismic interpretation and mapping costs as of closing, and it obligated
the parties to pay these past costs and 100% of any other 3-D seismic costs incurred
prior to the completion of drilling operations on the four projects.

If the scope of the parties=
arbitration agreement was determined solely by reference to the arbitration
provision, this dispute is clearly arbitrable. 
Under the expansive test articulated by the Waco Court in Dennis,
169 S.W.3d 282, the parties=
dispute touches matters which have a significant relationship with the JOAs,
and it cannot be said with positive assurance that the arbitration clause is
not susceptible of an interpretation which would cover their dispute.  Under the more restrictive approach
articulated by the San Antonio Court in Associated Glass, 147 S.W.3d at
513, the dispute still falls within the agreement=s
scope because it is not independent of the JOA. 
With the possible exception of the fraud claim, the working interest
owners would need the letter agreement and JOAs to establish the nature and
extent of Great Western=s
duty.

Of course, the JOAs are not interpreted solely by
reference to their arbitration provisions. 
Instead, the entire agreement must be considered.  Myers, 361 S.W.2d at 196.  Great Western argues that the dispute is not
arbitrable because Labors 1 and 10 are outside the contract area of the JOAs
and their AMI provisions.  Within these
contract areas, Great Western contends, the parties have a contractual
relationship, but beyond them they agreed to remain competitors.








Not all working interest owners concede that
Labors 1 and 10 are outside the AMIs=
contract area.  The Gulf Group contends
that its copy of the letter agreement did not include a map showing the area of
mutual interest.[9]  It acknowledges that the JOAs it received did
contain black and white maps but contends that these had thick lines and
included Labors 1 and 10 in the area of mutual interest.[10]  Even if Labors 1 and 10 are outside the AMI
contract area, the working interest owners collectively deny that this is
dispositive.

Whether the Gulf Group=s
copy of the letter agreement included the area-of-mutual-interest map is
immaterial.  The letter agreement
referred to the map. Thus, the Gulf Group was on notice of it.  See Westland Oil, 637 S.W.2d 903 (Gulf
and Superior were charged with notice of an operating agreement referred to in
their assignment and, therefore, to a letter agreement referred to in the
operating agreement).  The thickness of
the black line used to outline the area of mutual interest is also immaterial.  The JOAs specifically stated that the outline
Ashall be considered a line having no
width, running along the nearest boundary line of any separately surveyed
section or labor appearing on said plat.@  Utilizing this provision and the black and
white maps introduced at the trial court=s
hearing, it is clear that Labors 1 and 10 are outside the AMIs= contract area.  The AMIs limited the interest, which an
acquiring party was required to share, to interest covering lands within the
area of mutual interest.  Consequently,
the agreements= terms
would not require an acquiring party to share any interest in Labors 1 or 10.

4.  Did
the Parties Limit the Scope of the Arbitration Provision?

Even broad arbitration provisions have their
limits.  Pennzoil Exploration, 139
F.3d at 1067 n.8.  However, neither the
parties= briefing
nor our own research has revealed a case analyzing how that limit is defined
when the contract contains a broad arbitration provision but also limits the
duties and obligations the parties would otherwise owe one another.  For the reasons articulated, we find that,
when the parties specifically limit their duties and obligations, these
limitations must be considered when determining the scope of their arbitration
agreement.








To determine if the parties intended their
arbitration provision to reach disputes over wells drilled outside the AMIs= contract area, we must examine the
working interest owners contentions and contrast them with the JOAs= language.  Unlike Pennzoil Exploration or Dennis,
we do not have a transaction with multiple documents, only some of which
include arbitration agreements.  The
parties= relationship
is governed by the JOAs.  If their
dispute is within that defined relationship, the arbitration agreement applies.

We are mindful of our obligation to avoid
determining the merits of the claims.  See
Universal Computer Sys., 183 S.W.3d at 749. 
But, the Supreme Court in John Wiley & Sons v. Livingston,
376 U.S. 543, 557 (1964), distinguished between substantive arbitrability,
i.e., whether the dispute is encompassed by an agreement to arbitrate, and
procedural arbitrability, i.e., compliance with a condition to arbitrate.  Texas courts have followed this same
approach.  See Teco Pipeline, 2
S.W.3d at 583; City of Lubbock v. Hancock, 940 S.W.2d 123, 126 (Tex.
App.CAmarillo
1996, no pet.).  Accordingly, we assume
the claims are meritorious, ignore any procedural challenges, and determine if
the claims are within the scope of the parties=
agreement.

The working interest owners allege in their
arbitration statement that Great Western and Pathfinder owed fiduciary,
contractual, and common law duties.  They
identified these as:  the duty to tell
the truth, the duty to keep all information acquired during the joint venture
confidential, and the duty to use information bought and paid for by the joint
venture only in matters that were in the best interest of the venture=s members.[11]  They contend these duties were violated when
Great Western decided to obtain leases for, and to drill wells on, Labors 1 and
10 solely for its own benefit.  Their
requested relief essentially seeks a constructive trust by asking for the
revenue and interest that they would have received but for Great Western=s wrongful actions.  Presumably, this refers to their
proportionate share of the working interest, as defined by the JOAs, in the
Labors 1 and 10 wells.








Regardless of whether the working interest owners
are ultimately entitled to this revenue and interest, their claims are outside
the scope of the arbitration clause because the JOAs specifically disclaim the
duties upon which this claim must necessarily rest and the wells are beyond the
geographical boundary for the parties=
obligation to share future acquisitions. 
Clearly, the arbitration clause has broader reach than the JOAs, and we
do not read that agreement as applying only to claims arising directly under a
JOA.  Equally clearly, fact questions
concerning the breach of duties under a JOA or questions over the existence of
duties under a JOA are arbitrable claims. 
But, it cannot be reasonably said that B
when the parties specifically defined their duties and, with regard to future
acquisitions, imposed geographical and time limitations on them B they intended the arbitration clause
to apply to claims clearly beyond these definitions and limitations.

The working interest owners refer to themselves
and Great Western as joint ventures. 
But, the JOAs specifically disclaimed any joint venture.  Furthermore, the JOAs otherwise do not
support the existence of a joint venture. 
The elements of a joint venture in Texas are (1) mutual right of
control, (2) community of interest, (3) the sharing of profits as principals,
and (4) the sharing of losses, costs, or expenses.  Ayco Dev. Corp. v. G.E.T. Serv. Co.,
616 S.W.2d 184, 186 (Tex. 1981).  The
JOAs gave Great Western full control of all operations in the contract area and
recognized that it was an independent contractor not subject to the control or
direction of the working interest owners. 
See Hamilton v. Tex. Oil & Gas Corp., 648 S.W.2d 316, 320
(Tex. App.CEl Paso
1982,  writ ref=d
n.r.e.) (no joint venture because the operator had full control).

The working interest owners claim that Great
Western violated its fiduciary duty, but the JOAs specifically disclaim any
fiduciary duty or confidential relationship and reserve each parties= right to act on an arm=s-length basis to pursue their own
self-interest, Asubject,
however, to the obligation of the parties to act in good faith in their
dealings with each other with respect to activities hereunder@ (emphasis added).  The working interest owners seize upon this
last provision to support their contention that Great Western had potential
fiduciary duties to them, despite the JOAs=
language to the contrary.  The working
interest owners= position
does not take into account the difference between duties owed in connection
with operations in the contract area and a broader fiduciary duty requiring
Great Western to subvert its own interests in favor of the working interest
owners in other property.








Texas courts have consistently held that JOAs and
AMIs do not create fiduciary duties.[12]  Texas courts have also consistently
distinguished between duties owed in connection with lands within a JOA=s contract area and with property
outside the contract area.  For example,
in Rankin v. Naftalis, 557 S.W.2d 940 (Tex. 1977), Rankin and his
investors drilled two wells on the Melton lease.  The investors contended that Rankin promised
to acquire the Orsak lease for the benefit of the group.  Instead, he acquired this lease in his own
name and successfully drilled and completed a well on it.  The court concluded that Rankin breached no
duty to his investors because the obligations imposed by the parties= JOA did not extend to operations on
different lands.  Id. at 946.[13]  The court cited with approval the following
holding by the Kansas Supreme Court: AThe
fiduciary relationship created by a joint drilling venture does not forbid
further acquisition and development of leases in the general area by individual
venturers so long as these leases are not embraced within the scope of the
enterprise or are not a natural outgrowth therefrom.@  Id. at 945 (citing Foley v.
Phillips, 508 P.2d 975, 979 (Kan. 1973)).

The working interest owners also allege Great
Western breached its common law duties. 
If so, that duty is independent of the JOAs.  Texas courts have refused to recognize duties
inconsistent with a parties=
express rights under a JOA.  For example,
in Texstar N. Am. v. Ladd Petroleum Corp., 809 S.W.2d 672 (Tex. App.CCorpus Christi 1991, writ denied), the
court refused to recognize an implied duty of mutual cooperation between working
interest owners.  The operator proposed
fracture stimulating a well.  Because
that well was producing in paying quantities and the stimulation was considered
a work over, the consent of all working interest owners was required.  One working interest owner withheld its
consent.  The operator contended that it
did so because it had other wells in the immediate area which were draining
reserves that could be produced if the well was successfully stimulated.  The court held the working interest owner had
an absolute right to refuse to consent to the stimulation and, therefore, did
not breach a duty when it did so.  Id.
at 678.








The JOAs=
good faith requirement is, by its terms, limited to the contract area.  The provision does not purport to impose a
duty of good faith in all dealings between the parties, but only those
activities arising under the JOAs.  The
general rule is that operators are required to conduct their activities in good
faith because they have complete control over the operations.  Luling Oil & Gas Co. v. Humble Oil
& Ref. Co., 191 S.W.2d 716, 725 (Tex. 1945).  This does not, however, create a separate
cause of action apart from the JOAs.  Taylor
v. GWR Operating Co., 820 S.W.2d 908, 912 (Tex. App.CHouston
[1st Dist.] 1991, writ denied) (operator required to operate the property in
good faith, but if it overcharges the working interest owners, the cause of
action is for breach of contract and not for bad faith).

The working interest owners=
final contention is that Great Western improperly used confidential
information.  The JOAs prohibited the
disclosure of confidential information to third parties.  They did not prohibit the use of confidential
information for the parties=
own purposes.  The working interest
owners do not contend that Great Western shared confidential information with
anyone else.  The record suggests that
Great Western acted solely for itself when it acquired leases and drilled wells
on Labors 1 and 10.

Great Western=s
decision to acquire leases adjacent to the area of mutual interest and its
alleged statements to the working interest owners about its intentions
concerning those leases may give rise to one or more causes of action, but
these claims are not subject to the parties=
arbitration agreement (or its damage limitation provision).  The parties=
agreements give rise to defined duties and obligations within the contract area
and the area of mutual interest.  Among
these is the obligation to provide other parties an opportunity to participate
in future acquisitions.  No such
obligation exists beyond the area of mutual interest.

The working interest owners=
attorney conceded during the trial court=s
pretrial hearing that, if Great Western=s
wells had been five miles beyond the AMIs=
contract area, the arbitration provision might not apply.  We believe the parties designation of an area
of mutual interest and their definition of the interest subject to the AMIs
have more definite consequence.  Because
the working interest owners=
claims are clearly and indisputably beyond the JOAs=
defined duties and obligations, the JOAs=
arbitration provisions do not apply.  The
trial court abused its discretion when it stayed the litigation and compelled
the parties to attend arbitration.  Great
Western=s second
issue is sustained.








                                                                     V.
Holding 

The writ is conditionally
granted.  We are confident that the trial
court will rescind its August 3, 2006 order compelling arbitration within
fifteen days from the date of this opinion. 
Should it fail to do so, then writ of mandamus shall issue. 

 

 

RICK STRANGE

JUSTICE

 

November 30, 2006

Panel consists of: Wright, C.J.,

McCall, J., and Strange, J.











     [1]This
paragraph provides:

 

The liability of the parties shall be several, not joint or
collective.  Each party shall be
responsible only for its obligations, and shall be liable only for its
proportionate share of the costs of developing and operating the Contract
Area.  Accordingly, the liens granted
among the parties in Article VII.B. are given to secure only the debts of each
severally, and no party shall have any liability to third parties hereunder to
satisfy the default of any other party in the payment of any expense or
obligation hereunder.  It is not the
intention of the parties to create, nor shall this agreement be construed as
creating, a mining or other partnership, joint venture, agency relationship or
association, or to render the parties liable as partners, co-venturers, or
principals.  In their relations with each
other under this agreement, the parties shall not be considered fiduciaries or
to have established a confidential relationship but rather shall be free to act
on an arm=s-length basis in accordance with their own respective
self-interest, subject, however, to the obligation of the parties to act in
good faith in their dealings with each other with respect to activities
hereunder.





     [2]These
interests were described as: 

 

[A]
leasehold interest, royalty interest, overriding royalty interest, production
payment, mineral interest or other interest in oil, gas or minerals, farmin,
seismic and/or drilling option, including an extension or renewal of a
presently held interest, either directly or indirectly, on land within the AMI
(such interest, insofar and only insofar as they cover lands within the AMI
being herein called AAcquired Interests@).





     [3]See
9 U.S.C. '' 1-16.





     [4]See
Bates v. MTH Homes-Tex., L.P., 177 S.W.3d 419, 422 (Tex. App.CHouston [1st Dist.] 2005, no pet.) (courts may not
expand upon the terms of the contract or tolerate a liberal interpretation of
it by reading into it an agreement to arbitrate when one does not otherwise
exist); Belmont Constructors, Inc. v. Lyondell Petrochemical Co., 896
S.W.2d 352, 356 (Tex. App.CHouston [1st Dist.] 1995, no writ) (court cannot modify
or rewrite an unambiguous contract to accommodate arbitration).





     [5]The
agreement applied to Aany controversy or claim arising out of or relating to
this Agreement, or the breach thereof.@  169 S.W.3d at 284.





     [6]Accord
AutoNation USA Corp. v. Leroy, 105 S.W.3d 190, 195 (Tex. App.CHouston [14th Dist.] 2003, no pet.).





     [7]Accord
Pepe Int=l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 932 (Tex. App.CHouston [1st Dist.] 1996, no writ) (arbitration
agreement is separable from the entire contract and, therefore, is valid and
enforceable in spite of an attack made on the contract as a whole).





     [8]In
the following cases, the parties= relationship arose solely from a written agreement,
and their disputes were subject to arbitration provisions in that agreement: Capital
Income Properties B LXXX v. Blackmon, 843 S.W.2d 22 (Tex. 1992) (limited partnership agreement); Teco
Pipeline, 2 S.W.3d 576 (JOA); Dallas Cardiology Assocs., 978 S.W.2d
209 (employment agreement).





     [9]The
Gulf Group did not offer the trial court any evidence to support the contention
that their copy of the letter agreement did not include a map of the area of
mutual interest.  This point was
identified as a contention in the demand for arbitration, which was attached as
an exhibit to the working interest owners= motion
to stay the litigation and compel arbitration. 
In light of the deferential review accorded orders compelling
arbitration, we will assume this point was adequately developed below.





     [10]Great
Western=s Appendix includes colored maps.  The working interest owners object to our
consideration of these maps because they were not made a part of the trial
court=s record.  The
objection is well-taken and is sustained. 
We have limited our consideration to the black and white maps that were
included in the trial court=s record.  It is
unclear whether the Gulf Group=s maps were introduced into evidence.  The maps that were introduced into evidence
were exhibits to the working interest owners= demand
for arbitration.  The lines on these maps
are not inordinately wide.  The map
attached to the Latigo-Strawn Prospect JOA has a line which clearly and
unambiguously divides Labors 2 and 9, which are in the AMI contract area, from
Labors 1 and 10, which are not.





     [11]In
their brief, they also allege that Great Western=s wells
in Labors 1 and 10 were within the area of mutual interest shown on the Gulf
Group=s map.  As noted,
the Gulf Group provided the trial court with no evidence to support this
contention, and the maps that were tendered by the working interest owners
clearly and unambiguously indicate that Labors 1 and 10 were excluded from the
area of mutual interest.





     [12]See,
e.g., Crowder v. Tri-C  Res., Inc.,
821 S.W.2d 393, 399 (Tex. App.CHouston [1st Dist.] 1991, no writ); Taylor v. GWR
Operating Co., 820 S.W.2d 908, 912 (Tex. App.CHouston
[1st Dist.] 1991, writ denied); Texstar N. Am. v. Ladd Petroleum, 809
S.W.2d 672, 678 (Tex. App.CCorpus Christi 1991, writ denied).





     [13]See
also Smith v. Bolin, 271 S.W.2d 93 (Tex. 1954) (managing partner owed
fiduciary duty when he took new leases on property the partnership had leased,
but not as to leases which were not included in the parties= written contract); Warner v. Winn, 197 S.W.2d
338, 342 (Tex. 1946) (AThe parties did not undertake to engage generally in
the production and sale of gas from the Lopena field.  The extent of their enterprise or joint
venture was carefully defined by the contract. 
It contemplated and provided for the development of certain specified
and carefully described areas held under certain named and well identified
leases.@); McAlpin v. Sanchez, 858 S.W.2d 501, 507-08
(Tex. App.CCorpus Christi 1993, writ denied) (the duties and
rights under a JOA arise only during transactions relative to lands and leases
expressly covered by the agreement and not to proposed, but unacquired,
leases); Fuqua v. Taylor, 683 S.W.2d 735, 738 (Tex. App.CDallas 1984, writ ref=d n.r.e.)
(mere proximity is insufficient to extend a fiduciary duty from property within
the scope of a fiduciary relationship to other property).